IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JASON GONZALES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 C 7915 |
| | ) | |
| v. | ) | Judge Matthew J. Kennelly |
| | ) | |
| MICHAEL J. MADIGAN, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION TO ALTER JUDGMENT UNDER RULE 59(e) AND FOR LEAVE TO AMEND COMPLAINT UNDER RULE 15(a)**

NOW COMES Plaintiff, JASON GONZALES, by and through his counsel, and, pursuant to Rules 59(e) and 15(a) of the Federal Rules of Civil Procedure, moves this Honorable Court to alter the judgment entered in this action on June 20, 2017.

In its Order of June 20, 2017, this Honorable Court ruled that Plaintiff had failed to allege facts sufficient to demonstrate that the actions taken in Counts I–IV, VII–X, XIII–XVI, XXIII–XXVIII, and XXXIII–XXXVII of the first Amended Complaint (hereinafter the "Federal Counts") were under color of state law, and dismissing for lack of subject matter jurisdiction counts V–VI, XI–XII, XVII–XVIII, XX–XXII, XIX- XXXII, and XXXVIII–XXXIX of the first Amended Complaint (hereinafter the "State Counts"), claims made under Illinois law.

For the reasons stated herein Plaintiff asks that this Honorable Court (1) vacate its ruling on state action so to allow the Federal Counts to proceed; (2) vacate its dismissal of the State Counts on ground that jurisdiction exists with the reinstatement of the Federal Counts; and (3) grant Plaintiff leave to amend his Complaint to add a new count brought under 42 U.S.C. §1985(3). In support of this Motion Plaintiff states as follows:

I. **RECONSIDERATION ON THE ISSUE OF "STATE ACTION" IS JUSTIFIED IN LIGHT OF BINDING SUPREME COURT AND SEVENTH CIRCUIT CASE LAW NOT ADDRESSED IN THE ORDER OF JUNE 20, 2017.**

Requests for reconsideration under Rule 59(e) are to be taken carefully and with all respect for the dignity of the Court. A Rule 59(e) motion should be granted if there exists "a manifest error of law or fact," so as to enable "the court to correct its own errors and thus avoid unnecessary appellate procedures." *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996). Plaintiff undertakes this request solely to discuss a relevant Seventh Circuit precedent cited in the briefing but not previously addressed in this Court's reasoning, as well as United States Supreme Court precedents with which the current judgment will be in conflict in this Court's dismissal of Plaintiff's federal claims under 42 U.S.C. §1983 (2017) on ground of a failure to plead sufficient facts to permit a finding of acts taken under color of state law.

    A. **Under Binding Seventh Circuit and Supreme Court Precedent, the Participation of Defendants Madigan and Tabares in the Scheme Against Plaintiff Constituted Acts Under Color of State Law.**

Plaintiff respectfully suggests that the formulaic definition of "under color of state law" employed in the Order of June 20 placed an unduly limited scope on this Court's analysis. The definition of "under color of law" used in the Order of June 20 was taken from *United States v. Classic*, 313 U.S. 299, 326 (1941), which in turn first cited to *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 340, 25 L. Ed. 676 (1879), *Home Tel. & Tel. Co. v. City of Los Angeles*, 227 U.S. 278, 287, 33 S. Ct. 312, 314, 57 L. Ed. 510 (1913), and *Hague v. Commission for Industrial Organizations*, 307 U.S. 496, 509, 59 S. Ct. 954, 961, 83 L. Ed. 1423 (1939). All of the cases are over 75 years old, and neither *Classic*, nor *Commonwealth of Virginia* nor *Home Telephone* had any relation to discrimination or civil rights statutes at all. The *Hague* case

marginally did, as it involved the issuance of permits for an assembly and therefore freedom of speech, but the opinion actually contains no definition of the phrase.

Review of case law addressing discrimination since the issuance of *Classic* in 1941 reveals increasing flexibility, as courts have taken a decidedly less doctrinal approach to the issue. Rather than rely on formula, many courts now recognize that "state action is a concept whose outer limits are less than clear." *Nelson v. Dean*, 528 F. Supp. 2d 1271 (N.D. Fla. 2007). As stated by Plaintiff in earlier briefing, the question is a highly fact-specific inquiry. *Ali v. Village of Tinley Park*, 79 F. Supp. 3d 772, 775 (N.D. Ill. 2015), which must be taken without bright lines. *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir.1994).

An important change over time had been that the Supreme Court now views the formulations of "under color of state law" and "state action" as having the same meaning in the context of §1983 action. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, 102 S. Ct. 2744, 2752, 73 L.Ed.2d 482 (1982). See also *Thomas v. Pearl*, 998 F.2d 447, 450 (7th Cir. 1993), *Blum v. Yaretsky*, 457 U.S. 991, 102 S. Ct. 2777, 73 L.Ed.2d 534 (1982) and *Cuyler v. Sullivan*, 446 U.S. 335, 342, n. 6. 100 S. Ct. 1708, 64 L.Ed.2d 333 (1980). As will be shown below, that change brings to bear cases on "state action" that provide strong support for Plaintiff's federal claims under Section 1983.

In the case of *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973), cited by Plaintiff in briefing before this Court, the Seventh Circuit found state action in a fact pattern quite similar to Defendants' use of sham candidates Barbosa and Rodriguez. In *Smith*, the plaintiff alleged that an Illinois state senator redistricted into a new district withheld from filing nomination papers to run in Democratic Party primary for senator in the new district, but instead entered a conspiracy with party officials to become the nominee. The plaintiff alleged that the state senator and five

Democratic Ward Committeemen (the six comprising the committee that would nominate a candidate if a candidate vacancy arose), planned that a different candidate would run, and would be endorsed by the senator and the local political committees. After winning the primary, that candidate would withdraw, permitting the state senator to be nominated by the local committee members as the Democratic candidate. In effect, the primary winner was a sham candidate presented to the primary voters, as he had no intention of running in the general election.

The plaintiff in *Smith* invoked federal jurisdiction under Section 1983,[1] claiming that the political conspirators acted "to render the primary election a sham, and arrogate to the defendant Committeemen the selection of the nominee" which not only created a sham election for voters but caused the plaintiff "to have been deprived of his freedom to participate in the primary 'without unlawful interference by the defendant Committeemen acting under color of law' thus violating the First and Fourteenth Amendments." 489 F.2d at 1100.

The Seventh Circuit reversed dismissal of the claim, plainly finding that the participation of the state senator and political committee amounted to state action, noting that "[t]he interests of candidates in official treatment free from intentional or purposeful discrimination are entitled to constitutional protection.' 489 F.2d at 1103, quoting *Shakman v. Democratic Organization*, 435 F.2d 267, 270 (7th Cir. 1970).

The *Smith* case is no anomaly. In *Terry v. Adams*, 345 U.S. 461, 73 S. Ct. 809, 97 L. Ed. 1152 (1953), the Supreme Court addressed a situation in which a wholly private Texas county political organization had for decades conducted private membership votes for endorsement of candidates for public office in the county while excluding Blacks from membership, and therefore participation in the endorsement vote. While no endorsed candidate was required to

---

[1] *Smith* has been recognized as a §1983 case. See *Grimes v. Smith*, 776 F.2d 1359, 1366, n. 11 (7th Cir. 1985); *Grimes v. Smith*, 585 F. Supp. 1084 (N.D. Ind. 1984)(Posner, CJ sitting by designation).

4


file for election in the Democratic primary they routinely did and routinely faced no opponent in either the primary or the general election.  Black citizens sued the private organization, but <u>not</u> the State of Texas or any state official, for injunctive relief on claim that the private system effectively deprived Black citizens of their voting rights under the Fifteenth Amendment.  The Court of Appeals reversed a district court's judgment of final injunctive relief against the private organization, holding that the voting was a purely private political action and no state action was present.  The Supreme Court granted a writ of *certiorari*.

The Supreme Court upheld the injunction under the Fifteenth Amendment notwithstanding that all the participants in the organization votes were acting "privately."  In what remarkably parallels the power of Speaker Madigan and his political organizations in Illinois, Justice Black opined that: "The Democratic primary and the general election have become no more than the perfunctory ratifiers of the choice that has already been made in [private] elections from which Negroes have been excluded." 345 U.S. at 479.  While no state or other governmental authority was a party to the suit, Justice Black wrote that "[i]t violates the Fifteenth Amendment for a state, by such circumvention, to permit within its borders the use of any device that produces an equivalent of the prohibited election." *Ibid.*

Justice Frankfurter concurred, but expressed great concern over the lack of overt state participation while still finding state action in the fact that state officials privately participated in the endorsement voting:

> The State, in these situations, must mean not private citizens, but those clothed with the authority <u>*and the influence*</u> which official position affords. The application of the prohibition of the Fifteenth Amendment to 'any State' is translated by legal jargon to read "state action." This phrase gives rise to a false direction in that it implies some impressive machinery or deliberative conduct normally associated with what orators call a sovereign state. The vital requirement is State responsibility -- that somewhere, somehow, to some extent, <u>*there be an infusion of conduct by officials, panoplied with State power*</u>, into any scheme by

> which colored citizens are denied voting rights merely because they are colored.
>
> \* \* \*
>
> As a matter of practical politics, those charged by State law with the duty of assuring all eligible voters an opportunity to participate in the selection of candidates at the primary -- the county election officials who are normally leaders in their communities -- participate by voting in the Jaybird primary.

345 U.S. at 473. Concluding that "state authority has come into play," Justice Frankfurter wrote:

> If the [private political association], although not a political party, is a device to defeat the law of Texas regulating primaries, and if the electoral officials, clothed with State power in the county, share in that subversion, they cannot divest themselves of the State authority and help as participants in the scheme.

345 U.S. at 475-6.[2]

Parallel to *Smith* and *Terry*, action under color of state law is present when the Speaker of the Illinois House of Representatives and a State Representative, state officials whose duty is to uphold the law, not subvert it, use their huge "influence" and economic power to create the very "infusion of conduct by officials, panoplied with State power" into an otherwise private conspiracy to subvert an Illinois primary election by use sham candidates with Hispanic names but no intent of campaigning, all to deceive Hispanic voters in the 22nd District from voting for Plaintiff, a legitimate Hispanic candidate. See Second Amended Complaint at ¶¶ 32-39, 44-47, 82, 83, 91 and 120.

Plaintiff has affirmatively identified the influence, leverage and connections Defendant Madigan held and used to direct and/or obtain willful participation by the other codefendants in his plan to violate Plaintiff's federal rights by running candidates with Hispanic names who had

---

[2] Some questionable characterizations of *Terry* have been employed to limit its scope. For example, in *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 492 (7th Cir. 2000), *amended en banc* (Mar. 22, 2000), Terry was portrayed as "the delegation of elective process to private groups", when no such delegation occurred. Indeed, the entire thrust of *Terry* was that public officials had to a private conspiracy to subvert the electoral process to effect disenfranchisement of Black voters.
6

no intention of actually running or campaigning in a Hispanic-majority district. See Second Amended Complaint at ¶¶ 14, 15, 17, 20-23, 28-30, 33, 40-43, 49-53, 56, 58-60, 63, and 65-68. The use of "sham candidates" is well recognized in this Circuit as unlawful and a basis for a candidate to seek relief under the Civil Rights Acts. See, *e.g., Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973) and *Grimes v. Smith*, 585 F. Supp. 1084 (N.D. Ind. 1984)(Posner, CJ sitting by designation), aff'd 776 F.2d 1359, 1366 (7th Cir. 1985). The Supreme Court has held that the Fifteenth Amendment protects against vote dilution. *Terry supra; Smith v. Allwright*, 321 U.S. 649, 64 S. Ct. 757, 88 L.Ed. 987 (1944). Under the principles of state action articulated in the above-cited cases, the deep participation of the elected officials in the scheme to subvert a state election mandates a finding of state action under Section 1983.

  **B.** **Under Supreme Court Precedent, the Requirement of An Election to Achieve the Goal of the Conspiracy Places the Claim within the Scope of Section 1983.**

  A separate basis of state action rather than mere "private" conduct which also buttresses the principles stated in *Smith* and *Terry* is the fact that a state election was a required mechanism to achieve the ends of the conspiracy. In *Shelly v. Kramer*, 334 U.S.168, S. Ct. 836, 92 L.Ed. 11613 (1948), cited as support by the Court in *Terry*, the Supreme Court found the Fourteenth Amendment was applicable to allow assertion of Equal Protection to block enforcement of a restrictive covenant against minority purchase of real estate. The Court ruled that the requirement of state involvement by judicial enforcement of the covenant was sufficient to provide state action in what was otherwise a completely private transaction.

  As in *Shelly*, in the case at bar state participation was affirmatively required to effectuate the scheme of the Defendants against the Plaintiff. Under the Illinois Election Code, 10 ILCS 5/1-1. *et seq.* (2012), the state was required, through supervision and implementation by a variety

7

of state agencies including but not limited to the Illinois State Board of Election, the Clerk of the Circuit Court of Cook County and the Board of Election Commissioners of the City of Chicago, to participate in the election that involved the sham candidates put forward as part of Defendants' conspiracy. These actions were, *inter alia*, to generally authorize elections (Ill. Constitution of 1970 ("Ill. Const.") Article 4); accept the petitions of the sham candidates (10 ILCS 5/8-9); certify the sham candidates for the ballot `(10 ILCS 5/8-10)`; determine the placement of such sham candidates on the ballot `(10 ILCS 5/8-11, 12)`; to conduct the election itself (10 ILCS 5/Arts. 13 to 24C); to certify the election result `(10 ILCS 5/8-15)`; and finally to seat Defendant Madigan as the 22nd District State Representative (Ill. Const. Art. IV, Section 6(d)). All of these acts were required to be effectuated by state officials in order for the conspiracy to succeed. This case is controlled by the principle of state action articulated in *Shelly*.

In conclusion, under *Smith, Terry* and *Shelly* state action was present, allowing Plaintiff's claim under Section 1983 to proceed to the merits. Plaintiff therefore respectfully requests reconsideration of the dismissal with prejudice in this case.

**II.     THIS COURT SHOULD EXERCISE ITS DISCRETION UNDER F.R.CIV. P. 15(a) TO GRANT PLAINTIFF LEAVE TO AMEND HIS COMPLAINT TO STATE A CLAIM UNDER 42 U.S.C. §1985(3).**

Upon the facts already pleaded, Plaintiff plainly can plead a claim under 42 U.S.C. §1985(3), and therefore requests leave to do so under Fed. R. Civ. P. 15(a). Under federal law, because Plaintiff has already amended the Complaint more than once and judgment has been entered upon the last Motion to Dismiss filed by Defendants, amendment requires leave of court, which is a matter of the exercise of discretion. *Camp v. Gregory*, 67 F.3d 1286 (7th Cir. 1995). As has been done with this motion, under Seventh Circuit case law, Plaintiff must also move

under Rule 59(e) seeking to reopen the case, to preserve the jurisdiction of the court. *Camp, supra.* In evaluating the merits of the motion to vacate a judgment in which amendment is requested, a District Court is required to consider the merits of the movant's request for leave to amend its complaint. *Harris v. City of Auburn*, 27 F.3d 1284, 1287 (7th Cir. 1994).

Under the pleaded facts Plaintiff holds a claim under §1985(3), which states as follows:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. §1985(3)(2017).

In the seminal case of *Griffin v. Breckenridge*, 403 U.S. 88, 102-3, 91 S. Ct. 1790, 1798-9, 29 L.Ed.2d 338 (1971), the Supreme Court defined the elements of the claim:

> To come within the legislation a complaint must allege that the defendants did (1) "conspire . . . (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." It must then assert that one or more of the conspirators (3) did, or caused to be done, "any act in furtherance of the object of (the) conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

9

Importantly, in *Griffin* the Court also held that §1985(3) can reach purely private conspiracies to violate civil rights, meaning no state action or action under color of law is required. 403 U.S. at 101-2, 91 S. Ct. 1790, 1797-8.

The *Griffin* court opined that the statute also requires that "there be some racial, or perhaps otherwise class-based, invidiously discriminatory *animus* behind the conspirators' action." 403 U.S. at 102, 91 S. Ct. 1790, 1798. The Supreme Court to date has not comprehensively identified what "otherwise class-based" phrase imports. But in *United Brotherhood of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983), the Court held that economic or commercial *animus* was insufficient, but in *dicta* questioned whether a political *animus* should be sufficient, citing the intrusion of the courts into political disputes. The Seventh Circuit has since relied on *United Brotherhood* to hold that "§ 1985(3) does not reach nonracial political conspiracies." *Grimes v. Smith*, 776 F.2d 1359, 1366 (7th Cir. 1985). Given the language of the Supreme Court in *Griffin*, the only possible interpretation of the careful phrasing of the *Grimes* court is that <u>racial</u> political conspiracies such as in the case at bar <u>are</u> within the scope of Section 1985(3).

This conclusion is confirmed by review of *Quinones v. Szorc,* 771 F.2d 289, 291 (7th Cir.1985), in which the Seventh Circuit ruled that a Section 1985(3) conspiracy can be partially political in motive, so long as racial *animus* is present. In the case, a Hispanic plaintiff alleged that two white males conspired to intimidate and assault him to prevent him from campaigning for a Black candidate for Mayor of Chicago, then acted on the conspiracy by engaging in a physical assault. The *Quinones* court noted that the plaintiff was alleging that the conspirators "acted upon a racially-discriminatory animus directed against Quinones and other non-white citizens, and also against [the candidate] and his supporters," thus identifying both racial and

10

political motives of the conspiracy. 771 F.2d at 291. The Seventh Circuit reversed dismissal of the case.

In *Grimes*, the Seventh Circuit specifically approved the earlier holding in *Quinones*, stating that:

> Our holding today does not, of course, disturb our prior decisions in which we held that conspiracies animated by *both* racial and political motives were within the scope of § 1985(3). *See, e.g., Quinones v. Szorc,* 771 F.2d 289, 291-92 (7th Cir.1985).

*Grimes, supra,* 776 F.2d at 1366, n. 12.

*Quinones* and *Grimes* demonstrate a second key point for this case: while Section 1985(3) was passed to protect Blacks under attack in the American South, the "racial" component of a Section 1985(3) claim can be based on a Hispanic plaintiff. In *Quinones* 771 F.2d 289, 291 (7th Cir.1985), the court held that an allegation of "racially-discriminatory animus directed against [a Latino] and other non-white citizens" was sufficient to satisfy the class-based *animus* requirement. *Grimes* also has been interpreted as endorsing racial *animus* against Hispanics as a basis for a claim under Section 1985(3). *Gamboa v. Washington*, 1987 WL 11376, at *3 (N.D. Ill. May 19, 1987)(Plunkett, J.).

Section 1985(3) does not create a substantive right, requiring plaintiffs to identify a violation of some substantive or constitutional provision. *Great Am. Fed. Sav & Loan Assn. v. Novotny*, 442 U.S. 366, 372, 99 S. Ct. 2345, 2349, 60 L.Ed.2d 957 (1979). In this case that is more than met by the First, Fourteenth and Fifteenth Amendments.[3]

The Seventh Circuit has at times sought to limit the reach of Section 1985(3) by emphasizing the requirement stated in *Griffin* that Congress must possess the constitutional authority to regulate or prohibit the conduct alleged in a claim under Section 1985(3). See, *e.g.,*

---

[3] See argument *supra* on the presence of state action as required to assert claims.

11

*Murphy v. Mt. Carmel High School*, 543 F.2d 1189 (7th Cir. 1976), where the court affirmed dismissal of Section 1985(3) claim by a teacher who asserted that a private conspiracy of his employment managers to deprive him of his First Amendment right of free speech through adverse employment action. The *Murphy* court ruled that the text of the First Amendment itself applies only to the federal government, thereby creating a requirement of state action through the Fourteenth Amendment before it could be asserted.

No such issue is present in the case at bar, as the conduct at issue in this action is squarely that for which Section 1985(3) was passed to combat – providing a deterrent to the efforts of White supremacists "to resist and to frustrate the intended effects of the Thirteenth, Fourteenth and Fifteenth Amendments." *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 837, 103 S. Ct. 3352, 3360, 77 L. Ed. 2d 1049 (1983). The legislative history of the initial version of what is now codified as 42 U.S.C. §1985(3), Section 2 of the Ku Klux Klan Act of 1871,[4] was passed by Congress specifically in reaction to efforts of White gangs to intimidate, block from office and disenfranchise Blacks, all with intent to regain control of the political processes in formerly Confederate states. See, Pinzow, Is It Really All About Race?: Section 1985(3) Political Conspiracies In The Second Circuit And Beyond," 83 Forham L. Rev. 1031, 1039-46 (2014). The Act was passed upon the recognition that "The [Ku Klux] Klan and others were forcibly resisting efforts to emancipate Negroes and give them equal access to political power." *United Brotherhood, supra,* 463 U.S. at 836, 103 S. Ct. at 3360, (emphasis added). As stated by the author of the amendment that established the present text of Section 1985(3):

> The object of the amendment is ... to confine the authority of this law to
> the prevention of deprivations which shall attack the equality of rights of
> American citizens; that any violation of the right, the *animus* and effect of

---

[4] Act of April 20, 1871, ch. 22, 17 Stat. 13 at §2.

> which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section.

<u>Congressional Globe</u>, 42nd Cong., 1st Sess. 478, n.13 (1871)(remarks of Rep. Shellabarger). While removed by more than a century, the principle of what Plaintiff seeks to allege is the same: a conspiracy to block a minority candidate from political power based upon racial *animus*.

Plaintiff's proposed claim meets the test of law. A Section 1985(3) complaint "must simply plead sufficient facts from which a conspiracy can be inferred; the facts detailing the conspiratorial agreement can be pleaded generally, while those facts documenting the overt acts must be pleaded specifically." *Quinones v. Szorc,* 771 F.2d 289, 291 (7th Cir.1985). Further:

> A plaintiff seeking redress need not prove that each participant in a conspiracy knew the exact limits of the illegal plan or the identity of all participants therein. An express agreement among all the conspirators is not a necessary element of a civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was a single plan, the essential nature and general scope of which (was) known to each person who is to be held responsible for its consequences.
> .

*Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S. Ct. 1987, 64 L. Ed. 2d 670 (1980), quoting, *Hoffman-LaRoche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971).

Plaintiff's proposed claim meets the test of law. A Section 1985(3) complaint "must simply plead sufficient facts from which a conspiracy can be inferred; the facts detailing the conspiratorial agreement can be pleaded generally, while those facts documenting the overt acts must be pleaded specifically." *Quinones v. Szorc,* 771 F.2d 289, 291 (7th Cir. 1985). In his proposed second Amended Complaint, Plaintiff alleges that Defendants engaged in agreement to a conspiracy with a purpose of depriving Plaintiff of equal protection of the laws or of equal

privileges and immunities under the First, Fourteenth and Fifteenth Amendments of the Constitution including but not limited to support for the use of sham candidates, defamation and dilution of votes.. (Second Amended Complaint, attached hereto as Exhibit "A") at ¶¶ 388, 392, 393, 394). Plaintiff alleges acts in furtherance of the conspiracy. (¶¶ 395, 397, 398). At least one sham candidate received employment with the State of Illinois soon after the election. (¶ 399). Further, Plaintiff's allegations are that the conspiracy was based upon animus towards Plaintiff based upon his Hispanic race. (¶¶ 389, 390). Plaintiff has alleged injury by deprivations of rights (¶400), and injury to his person and property (¶401) caused by the actions of Defendants.

Plaintiff's proposed amendment plainly states a sound claim under §1985(3) in Count XL. Leave to amend is therefore requested.

WHEREFORE, Plaintiff, JASON GONZALES, respectfully requests that this Honorable Court grant the following relief:

A. Alter the judgment entered in this action on June 20, 2017 by vacating said judgment as to Counts I–IV, VII–X, XIII–XVI, XXIII–XXVIII, and XXXIII–XXXVII, V–VI, XI–XII, XVII–XVIII, XX–XXII, XIX- XXXII, and XXXVIII–XXXIX and permitting the case to proceed upon said Counts with assertion of supplemental jurisdiction over state law claims;

B. Grant Plaintiff leave to amend his Complaint to add a new count brought under 42 U.S.C. §1985(3); and,

C. Such other and further relief and this Honorable Court deems appropriate in the premises.

Respectfully submitted,

ANTHONY J. PERAICA & ASSOCIATES, LTD.

By: /s/ Anthony J. Peraica

Anthony J. Peraica
ARDC No. 6186661
ANTHONY J. PERAICA & ASSOCIATES, LTD.
5130 S. Archer Avenue
Chicago, Illinois 60632
773-735-1700 – office
773-585-3035 – facsimile
peraicalaw@aol.com
*Attorney for Plaintiff*