# Exhibit

# 4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JASON GONZALES,                        )
                                       )
                                       )
         Plaintiff,                    )
                                       )
                                       ) No. 2016 C 7915
         -vs-                          )
                                       )
MICHAEL J. MADIGAN, FRIENDS            )
OF MICHAEL J. MADIGAN, 13TH            )
WARD DEMOCRATIC ORGANIZATION           )
SHAW DECREMER, SILVANA                 )
TABARES, RAY HANANIA,                  )
JOE BARBOZA and GRASIELA               )
RODRIGUEZ,                             )
                                       )
         Defendants.                   )

     This is the discovery deposition of MICHAEL J. MADIGAN, called as a witness by the Plaintiff herein, pursuant to the provisions of the Federal Rules of Civil Procedure pertaining to the taking of depositions before Kimberly E. Causley, Certified Shorthand Reporter, of the State of Illinois, pertaining to the taking of depositions at 151 North Franklin Street, commencing on September 13, 2018, at the hour of 11:00 a.m., pursuant to notice and the agreement of Counsel.

- - o o 0O o o - -

## Page 34

1   Q   What were your responsibilities in that
2   position?
3   A   I was a delegate to the convention.
4   Q   Was that a paid or unpaid position?
5   A   Compensated position.
6   Q   Was it considered full time or part time?
7   A   For me it was full time.
8   Q   And were you compensated by the State of
9   Illinois?
10  A   Yes.
11  Q   So during that period from December of '69
12  to September of 1970, you were a convention delegate
13  working on the drafting of the Illinois State
14  Constitution?
15  A   Yes.
16  Q   After that employment ended in September of
17  1970, where did you go to work then?
18  A   The Illinois House of Representatives.
19  Q   When were you first sworn-in?
20  A   January of '71.
21  Q   And you have been serving in that capacity
22  until the present time?
23  A   Yes.
24  Q   You're also a principal in the Law Firm of

## Page 35

1   Madigan & Getzendanner, is that correct?
2   A   The answer is yes.
3   Q   And how long have you worked in that
4   capacity as a principal at that law firm?
5       MR. VAUGHT: Okay. Tony, I'm going to
6   object here. The scope of deposition says, "The scope
7   shall be restricted as follows: (b) Counsel for
8   Plaintiff shall not question Defendant Madigan
9   regarding his law practice."
10      MR. PERAICA: I'm not. I'm just asking for
11  a diagraphical background information from when to when
12  was the deponent principal in Madigan & Getzendanner,
13  that's all.
14      MR. VAUGHT: Then we're going to move on?
15      MR. PERAICA: Yeah.
16      THE WITNESS: Tony, I started my law firm
17  in, I believe, 1972. And thereafter, why I was
18  associated with multiple lawyers and eventually it
19  became Madigan & Getzendanner, but I'm not certain of
20  the date that it became Madigan & Getzendanner.
21  BY MR. PERAICA:
22  Q   Were you an equity partner or owner since
23  1972 in whatever formation or names were used?
24  A   For one period it was a loose arrangement

## Page 36

1   among lawyers in terms of cost sharing, so I wouldn't
2   remember today what the structure or the arrangement
3   was.
4   Q   But the Firm of Madigan & Getzendanner has
5   been around since what year?
6   A   I don't recall exactly when it became
7   Madigan & Getzendanner.
8   Q   It's been a while?
9   A   It's been a while.
10  Q   Okay. Your father, was he also named
11  Michael Madigan?
12  A   Yes.
13  Q   Did he have a different middle initial?
14  A   It was Michael J. Madigan.
15  Q   Michael J. Okay.
16      Do you have any siblings?
17  A   Yes.
18  Q   How many?
19  A   One.
20  Q   What is the name?
21  A   Marita M-a-r-i-t-a.
22  Q   Last name?
23  A   McGivney McGiveney M-c capital G-i-v-n-e-y.
24  Q   And how old is your sister?

## Page 37

1   A   She is 71.
2   Q   Are both your mother and father deceased?
3   A   Yes.
4   Q   I know your father was involved in
5   politics, was your mother involved in politics as well
6   when she was alive?
7   A   No.
8   Q   Your wife Shirley, is she involved with any
9   committees that you were working with or control?
10  A   She's the Chair of the Illinois Arts
11  Council, which is a State agency appointed by the
12  Governor.
13  Q   And the appropriation for the Illinois Arts
14  Council comes from the State taxpayers?
15  A   From the Illinois Legislature.
16  Q   Right, as part of the State budget?
17  A   Yes.
18  Q   Is your wife Shirley involved in any other
19  way in any of the governmental work or State agency
20  work or any board memberships in any other way besides
21  Illinois Arts Council?
22  A   Governmentally it you would be restricted
23  to the Arts Council. Now, she's involved with other
24  arts organizations such as the Erikson Institute. I

### Page 54

1. their services?
2. A   Today I don't remember if we do today. We
3. may have in the past.
4. Q   How about between April of 2015 and April
5. of 2016?
6. A   Same answer. I don't remember, but we may
7. have.
8. Q   Do you know how many people you have on
9. staff as a Democratic Committeeman of the 13th Ward?
10. A   No.
11. Q   And do you know how those individuals, if
12. you do have them, would get paid and from where?
13. A   Well, there would be a payroll check
14. written for them.
15. Q   And would Marsha Thomas handle that as
16. well?
17. A   No.
18. Q   Who handles that?
19. A   The checks at the 13th Ward are prepared by
20. Sue Carpentier.
21. Q   Sue Carpenter?
22. A   Carpentier.
23. Q   Carpentier.
24. A   Yeah.

### Page 55

1. Q   And where does she work?
2. A   At 6500 South Pulaski.
3. Q   And what is her function there?
4. A   She writes the checks to pay the bills.
5. Q   For the 13th Ward Democratic Organization?
6. A   Yes.
7. Q   Any others?
8. A   No, just the bills that come in for the
9. 13th Ward Organization. The bills that are going to be
10. paid by the 13th Ward Democratic Organization.
11. Q   Is this the same account that Marsha Thomas
12. uses to pay the rent?
13. A   No.
14. Q   That's a separate account?
15. A   Well, you recall I told you that I use my
16. personal money to pay for my space.
17. Q   All right.
18. A   That's the check that's prepared by Marsh
19. Thomas.
20. Q   When you say "personal money," is that
21. money coming from Madigan & Getzendanner Law Firm or is
22. it from your personal checking or savings account?
23. A   Personal account.
24. Q   How many hours a week do you dedicate to

### Page 56

1. the work as a 13th Ward Committeeman on average?
2. A   As needed.
3. Q   At the height of the Primary Election
4. campaign, what would be your involvement as a
5. committeeman at that time?
6. A   Again, as needed.
7. Q   How many precinct captains do you have as a
8. 13th Ward Committeeman?
9. A   Today I believe there are about 55
10. precincts in the 13th Ward.
11. Q   I thought there were 48 myself, but is
12. that -- you don't know or?
13. A   Your count -- your number may be correct.
14. Q   But in terms of precinct captains you
15. estimate about 55?
16. A   Whatever the number of precincts then that
17. would be the number of precinct captains.
18. Q   So if there are 48 precincts you --
19. A   48 captains.
20. Q   What is the extent of your interaction with
21. the precinct captains of the 13th Ward Democratic
22. Party, how often do you meet with them?
23. A   A minimal amount of time.
24. Q   Do you have someone who coordinates that on

### Page 57

1. a more regular basis with the precinct captains?
2. A   Alderman Quinn.
3. Q   Anybody else other than Alderman Quinn who
4. interacts with the precinct captains on a regular
5. basis?
6. A   Well, today there's a man named Moe Zahdan
7. who works with Alderman Quinn.
8. Q   He's the, I believe, what Chief of Staff
9. or --
10. A   No.
11. Q   -- Superintendent?
12. A   He's the Ward Superintendent.
13. Q   So Moe Zahdan is the Ward Superintendent of
14. the 13th Ward also assists Alderman Quinn and you to
15. work with the precinct captains throughout the year but
16. especially during and leading up to election?
17. A   The answer is yes.
18. Q   Do you join the committeeman to go
19. door-to-door in any outreach efforts to the
20. constituents?
21. A   No.
22. Q   Have you done that during the 2016 primary
23. cycle?
24. A   No.

Michael J. Madigan
September 13, 2018

**Page 70**

1. Q  Do you?
2. A  Yes, I do.
3. Q  Do you also serve in addition to Third
4. Congressional District Democratic State Central
5. Committeeman, do you also serve as a Chairman of the
6. Democratic Party?
7. A  Yes, I do.
8. Q  And how are you elected in that role?
9. A  By other members of the State Committee.
10. Q  And there are two from every Congressional
11. District?
12. A  Yes.
13. Q  And who is your running mate in the Third
14. Congressional District as a State Central Democratic
15. Committeeman?
16. A  Silvana Tabares.
17. Q  Who is in the past been a member of the
18. Illinois House of Representatives?
19. A  The answer is yes.
20. Q  And currently serves as an Alderman of the
21. adjacent to the 23rd Ward?
22. A  The answer is yes.
23. Q  Which is also part of your 22nd District,
24. parts of it at least --

**Page 71**

1. A  The answer is yes.
2. Q  23rd Ward, correct?
3. A  The answer is yes.
4. Q  Did you have anything to do with her,
5. meaning, Silvana Tabares, being placed as a running
6. mate with you for the Third Congressional District
7. State Central Committeeman?
8. A  Yes, I did.
9. Q  How so?
10. A  I met with her and suggested that she might
11. want to run for the office, and she agreed to do it.
12. Q  Have you met or interviewed any other
13. potential candidates?
14. A  No.
15. Q  She was the only one?
16. A  Yes.
17. Q  You asked her and she said yes?
18. A  The answer is yes.
19. Q  Did you pay for that campaign for you and
20. Silvana Tabares to run as candidates in the Third
21. Congressional District for State Central Committeeman?
22. A  I believe we ran a joint campaign which was
23. paid for probably by Friends of Michael J. Madigan.
24. Q  Did you ask Silvana Tabares as part of her

**Page 72**

1. joining you in this race in the Third Congressional
2. District for State Central Committeeman that she
3. contribute funds?
4. A  I believe the answer is no.
5. Q  As a member of the State Central Committee
6. and as a Chairman of the Democratic Party, do you get
7. to elect the Executive Director of the Democratic
8. Party?
9. A  Historically, the Chair is appointed the
10. Executive Director.
11. Q  And who appoints the Executive Director?
12. A  As I said, historically the chair --
13. Q  Right.
14. A  -- appointed the Executive Director.
15. Q  That would be you?
16. A  Yes.
17. Q  In April 2015 through April of 2016, who
18. was the Chairman of the Democratic -- who was the
19. Executive Director of the Democratic Party?
20. A  Tim Mapes.
21. Q  Who was also your Chief of Staff as a
22. Speaker of the House?
23. A  Yes.
24. Q  And in that same period April of 2015

**Page 73**

1. through April of 2016, you were the Chairman of the
2. Democratic Party of the State of Illinois, correct?
3. A  Yes.
4. Q  You were the Third Congressional District
5. Committeeman?
6. A  Yes.
7. Q  You were there 13th Ward Committeeman?
8. A  Yes.
9. Q  You were the 22nd District House of
10. Representative member?
11. A  Yes.
12. Q  You were Speaker of the House?
13. A  Yes.
14. Q  What would be the purpose of running for
15. Third Congressional District State Central Committeeman
16. with all the other responsibilities that you have?
17. A  My purpose would be to become a member of
18. the State Committee so I'm active in Illinois
19. Democratic politics, and I would have a choice to be a
20. member of the State Committee or not be a member of the
21. State Committee. Given my level of interest in
22. Democratic politics in Illinois why I chose to attempt
23. to become a member of the State Committee.
24. Q  And what benefits do you get from that

19 (Pages 70 to 73)

CAUSLEY COURT REPORTING
(708) 989-0509

## Page 82

1  Democratic Party of Illinois, did you relocate the
2  headquarters of the Party from Chicago to Springfield?
3      A   I wouldn't say that I relocated the
4  headquarters. The Democratic Party of Illinois
5  maintains an office in Springfield, and it maintains an
6  office in Chicago.
7      Q   Where is the office in Chicago for the
8  Illinois State Democratic Party?
9      A   111 West Washington.
10     Q   And where is the office for the State Party
11 in Springfield?
12     A   It's at the intersection of Veterans
13 Parkway and Monroe.
14     Q   Besides you as the Chairman of the
15 Democratic Party and your appointed interim Executive
16 Director Representative of Christian Mitchell, are
17 there any other individuals who serve in administrative
18 functions at State of Illinois Democratic Party?
19     A   Yes, there's a Mary Morrisey who is the
20 Chief Operating Officer, and there's an Emily Wurth
21 W-u-r-t-h who is the Chief Finance Officer.
22     Q   Any others?
23     A   There are other employees there, but the
24 names I've given you would be the main people.

## Page 83

1      Q   How many employees are there total at the
2  both Chicago and the Springfield offices?
3      A   I don't know the answer to the question,
4  and it fluctuates so during campaigns there's more.
5  When you're not in a campaign season there's less.
6      Q   Okay. Going to the 13th Ward Democratic
7  Organization, is there a membership requirement for
8  acceptance as a member of the 13th Ward Democratic
9  Organization?
10     A   Well, we would hope that they're Democrats.
11     Q   Anything else?
12     A   There is -- the answer is no.
13     Q   So there's no membership fee or anything of
14 that sort that one would have to pay?
15     A   The answer is yes. There is no membership
16 fee.
17     Q   Does one have to by necessity serve as a
18 precinct captain or assistant precinct captain or is
19 that optional?
20     A   That's optional. That's a decision to be
21 made by the individual.
22     Q   And the final call as to who would be the
23 precinct captain in any precinct in the 13th Ward is
24 made by you as Committeeman?

## Page 84

1      A   Upon recommendation of Alderman Quinn.
2      Q   Does anyone else provide advice and consent
3  or is it just Alderman Quinn?
4      A   We're like you we listen to everybody.
5      Q   Okay. But ultimately the call is yours as
6  to who would be in that position as a precinct captain?
7      A   Well, under the statute.
8      Q   Yeah. So you can remove someone at will if
9  you wanted to as a Democratic precinct captain?
10     A   The answer is yes.
11     Q   Other than you and Alderman Quinn is anyone
12 else -- well, you said Moe Zahdan would assist, other
13 than the three of you is anyone else working on a
14 regular basis to interact with the captains or
15 administer the 13th Ward Regular Democratic
16 Organization?
17     MR. KASPER: Excuse me. Tony, are you
18 talking about now?
19     MR. PERAICA: I'm talking about the period
20 during April of 2015 through April of 2016.
21     MR. KASPER: So all this -- we'll just
22 assume that all this line of questioning is --
23     MR. PERAICA: Yes.
24     MR. KASPER: -- confined to that window of

## Page 85

1  time?
2      MR. PERAICA: Correct.
3      THE WITNESS: Restate the question.
4  BY MR. PERAICA:
5      Q   Other than yourself, Alderman Marty Quinn,
6  Moe Zahdan, who is the Ward Superintendent and Chief of
7  Staff to Quinn, anyone else working with the precinct
8  captains of the 13th Ward Democratic Organization on a
9  regular basis?
10     A   During that time period that you set out?
11     Q   Yes.
12     A   Kevin Quinn.
13     Q   And what was Kevin Quinn's role?
14     A   To work with and interact with the precinct
15 captains.
16     Q   Was he a precinct captain coordinator as
17 one would be normally called?
18     A   The answer is yes.
19     Q   And is Kevin Quinn still with your 13th
20 Ward Democratic Organization?
21     A   No.
22     Q   What happened there?
23     A   He was terminated.
24     Q   By?

## Page 86

1  A   Me.
2  Q   And that was your unilateral decision?
3  A   Yes.
4  Q   And why did you terminate him?
5  A   Because of wrongdoing on his part.
6  Q   And the wrongdoing would be what?
7      MR. KASPER: Objection.
8      MR. VAUGHT: I will object this is outside
9  of the scope. This was post April 2016. It's not
10 relevant to this lawsuit.
11 BY MR. PERAICA:
12 Q   Well, did it have to do with his work on
13 the political front for you as a Committeeman?
14 A   The answer to that question is no.
15 Q   Did it have to do with his outside
16 activities outside of the 13th Ward Democratic
17 Organization?
18     MR. KASPER: Objection.
19     MR. PERAICA: Yes.
20     MR. KASPER: That by itself proves that
21 it's outside the scope of the deposition.
22     MR. PERAICA: During that period.
23     MR. KASPER: This is not covered by the
24 scope of the deposition.

## Page 87

1      MR. PERAICA: What paragraph are you
2  referring to?
3      MR. VAUGHT: 2(d).
4      MR. PERAICA: Well, let's take a break, if
5  we may at this point, and we'll come back with that
6  question.
7      THE VIDEOGRAPHER: This is the end of Tape
8  1. We're off the record at 12:32.
9
10         (WHEREUPON, a break was had.)
11
12     MR. PERAICA: Back on the record.
13     THE VIDEOGRAPHER: Tape 2 back on the
14 record at 12:51.
15
16         (WHEREUPON, the deposition of
17         Michael J. Madigan was
18         resumed.)
19
20 BY MR. PERAICA:
21 Q   Mr. Madigan, we were talking about the
22 structure that you had at the 13th Ward Democratic
23 Organization at 6500 South Pulaski, and you mentioned
24 in addition to yourself as Committeeman, Alderman Marty

## Page 88

1  Quinn being a close associate and assistant in terms of
2  the work of the organization and Kevin Quinn who is
3  Marty Quinn's brother, is that correct?
4  A   That's correct.
5  Q   Being a precinct captain coordinator, would
6  any other individuals besides them -- besides you and
7  Marty and Kevin Quinn who worked as coordinators or
8  leaders of the 13th Ward Democratic Organization?
9  A   During that period of time?
10 Q   Correct.
11 A   Those are the two that I would know of.
12 Q   Does Moe Zahdan have a particular role
13 within the 13th Ward Democratic Organization either
14 loosely assigned or a structure?
15 A   He would work with Alderman Quinn in terms
16 of coordinating activities of Members of the Ward
17 Organization.
18 Q   So who -- since you don't deal with the
19 precinct captains directly, who would report to you as
20 to any concerns that they would have?
21 A   Alderman Quinn.
22 Q   Does Moe Zahdan report to Alderman Quinn
23 who then reports to you or does Moe Zahdan report
24 directly to you?

## Page 89

1  A   Moe does not report directly to me.
2  Q   So he would go through Alderman Marty
3  Quinn?
4  A   That's correct.
5  Q   Does Kevin Quinn report directly to you or
6  does he go through his brother Marty Quinn?
7  A   Kevin Quinn has been terminated.
8  Q   I know while he worked.
9  A   He would have reported to his brother.
10 Q   Marty Quinn?
11 A   Yes.
12 Q   As I was looking at the D-2s for payment
13 made to the political workers and operatives, there was
14 a distinction between a merit pay and a bonus pay, are
15 you familiar with that?
16 A   I'm familiar with payments made to people
17 for political work without regard to the adjective that
18 you used.
19 Q   So did the 13th Ward Democratic
20 Organization pay precinct captains bonus money for
21 political work?
22 A   The answer is yes.
23 Q   And what would be the criteria to qualify
24 for receiving a bonus pay?

## Page 130

1  a Loyalty Oath.
2  Take at a look at these first two
3  pages.
4  A   Yeah, that's my signature.
5  Q   That was my question.
6  So looking at the first page of this
7  nominating petition set which is entitled Nomination --
8  pardon -- it's titled "Statement of Candidacy." It
9  contains your signature down here?
10 A   Yes.
11 Q   Did you sign that in front of a Notary?
12 A   The answer would be yes.
13 Q   And the Notary was Shaw Decremer?
14 A   That's the name that's on there.
15 Q   And then looking at the second page of this
16 petition packet document titled "Loyalty Oath."
17 Do you see that?
18 A   Yes, I do.
19 Q   And it contains a signature here at the
20 bottom, whose signature is that?
21 A   That's my signature.
22 Q   Did you sign this document in front of Shaw
23 Decremer?
24 A   That's how the document reads.

## Page 131

1  Q   Were both of these documents signed by you
2  in front of Shaw Decremer on November 14, 2015?
3  A   That's how the document reads.
4  Q   Well, you have no recollection?
5  A   Correct.
6  Q   Do you remember signing these at all?
7  A   No.
8  Q   How do you know Shaw Decremer?
9  A   At one time he was one of our staffers,
10 today he's a lobbyist.
11 Q   When you say "Shaw Decremer was one of your
12 staffers," can you be more specific?
13 A   No, because I don't remember which unit he
14 worked with or the timeline that he worked for us. I
15 just know that at one time he was one of our staffers.
16 Q   Okay. And he was a staffer for you in your
17 role as Speaker of the House?
18 A   Well, he would have been a staffer for one
19 of those units that I set out for you.
20 Q   One of the units that you control and
21 monitor and supervise as a Speaker of the House?
22 A   That's correct.
23 Q   And he was with you for about 10 years or
24 more?

## Page 132

1  A   I don't remember.
2  Q   Was Shaw Decremer a member of the 13th Ward
3  Democratic Organization?
4  A   Not to my knowledge.
5  Q   Did he have an office or a space at 6500
6  South Pulaski, second floor?
7  A   Not to my knowledge.
8  Q   Was he ever there?
9  A   He may have been in that space.
10 Q   Well, did he have you sign these documents
11 Statement of Candidacy and Loyalty Oath on
12 November 14, 2015 in the office at 6500 South Pulaski?
13 MR. KASPER: Objection. He already stated
14 he doesn't remember signing it.
15
16 BY MR. PERAICA:
17 Q   If you remember, that's a specific
18 question.
19 A   No, I don't remember.
20 Q   Do you remember Shaw Decremer coming to
21 your house to have you sign these?
22 A   No, I don't remember that.
23 Q   Was Shaw Decremer ever at your house?
24 A   Not to my knowledge.

## Page 133

1  Q   Does the organization maintain a list of
2  Notary, people who have a commission as a Notary Public
3  in the 13th Ward Regular Democratic Organization?
4  A   I do not know of a formal list of Notary
5  Publics, no.
6  Q   I want to show you what I will mark as
7  Madigan Exhibit 2. Madigan Deposition Exhibit 2.
8
9        (WHEREUPON, said document was
10       so marked as Madigan Deposition
11       Exhibit No. 2, for identification.)
12
13 BY MR. PERAICA:
14 Q   Can you please take a look at what we
15 marked as Madigan Exhibit 2?
16 A   Ready.
17 Q   This is again a printout of a website paid
18 for by the 13th Ward Regular Democratic Organization
19 titled "Madigan-Quinn Website." It has the two offices
20 at 6500 South Pulaski and 6014 South Central, and it
21 lists here a 13th Ward Constituent Service, again,
22 numbers, and then a list of services provided.
23 Do you see that?
24 A   I do.

Page 142

1  at 6014 South Central?
2    A   Not that I remember.
3    Q   Did you ever have a campaign office for any
4  of your races separate and apart from 6500 South
5  Pulaski?
6    A   I don't remember that.
7    Q   Is it true that the circulation of the
8  petitions for March 2016 primary cycle begin sometime
9  at the end of September, I believe?
10   A   That sounds correct.
11   Q   When did you first learn about the other
12 candidates in your 22ndDistrict Democratic Primary
13 Race?
14   A   Sometime before the filing.
15   Q   Well, the filing was at the end of November
16 of 2015, was that the first time you found out about
17 it?
18   A   No, we knew that there were other
19 candidates that wanted to file in the Democratic
20 Primary Election.
21   Q   How did you learn that?
22   A   Just by word-of-mouth.
23   Q   Who told you about that?
24   A   I don't recall.

Page 143

1    Q   When did you learn that other candidates
2  may be running in the March 2016 Primary?
3        MR. KASPER: Objection. He already said he
4  did not recall.
5  BY MR. PERAICA:
6    Q   I thought you said it was shortly before
7  the filing date?
8    A   Well, it was certainly before the filing.
9    Q   Isn't it true that you also knew about
10 potential, other potential candidates, well before the
11 November 2015 filing date?
12   A   I don't recall when I learned that there
13 were others that wanted to file in the primary.
14   Q   Well, you said you heard through the
15 grapevine that other candidates were gearing up, did
16 you learn that in July of 2015?
17   A   I don't remember.
18   Q   Did you learn about it in August of 2015?
19   A   I don't remember.
20   Q   September of 2015?
21   A   I don't remember.
22   Q   October of 2015?
23   A   I don't remember.
24   Q   So it was November of 2015 when you recall?

Page 144

1        MR. SULLIVAN: You know what come on, Tony.
2  He said he doesn't recall.
3  BY MR. PERAICA:
4    Q   Did you have Sunday telephone conferences
5  in relation to your campaign?
6    A   The answer is yes.
7    Q   When did you begin to have those telephone
8  conference on Sundays?
9    A   I don't remember.
10   Q   Was it before the filing date in November
11 of 2015?
12   A   I don't remember but it probably was.
13   Q   Was it in September of 2015 leading up to
14 November filing date?
15   A   I don't remember.
16   Q   It was sometimes in the second half of
17 2015?
18   A   I just don't remember.
19   Q   But was it in the second half of 2015?
20   A   I don't remember.
21   Q   Is there anything that you remember about
22 when you had these Sunday teleconferences begin?
23   A   Yes, they were on Sunday mornings.
24   Q   But besides that you have no recollection

Page 145

1  of the time frame?
2    A   It would have been around all these
3  campaign activities.
4    Q   And who would originate these
5  teleconferences on Sunday mornings?
6    A   I don't remember.
7    Q   Did you call from your house or were you at
8  the office?
9    A   I was at 6500 South Pulaski.
10   Q   Would these other participants call into
11 the office then and join in?
12   A   Some would be at the office and some would
13 call in.
14   Q   All right. Who other than yourself
15 participated in these Sunday morning teleconferences?
16   A   I don't remember.
17   Q   Was Marty Quinn part of the conference?
18   A   Marty Quinn was.
19   Q   Was Will Cousineau part of the
20 teleconference?
21   A   He was part of the calls.
22   Q   And who -- what was his function at that
23 time at the end of 2015 -- second half 2015?
24   A   He was a campaign supporter.

Page 146

1   Q   What else?
2   A   Campaign supporter.
3   Q   Did he --
4   A   He worked on the campaign.
5   Q   Did he work for the State of Illinois in
6   anyway?
7   A   Not at that time.
8   Q   Did he work after?
9   A   The answer is yes.
10  Q   Where did he work at at the State?
11  A   He worked in -- he worked in the Speaker's
12  Office. He was the head of the Issues Development
13  Unit.
14  Q   So Will Cousineau -- you have that spelling
15  I believe, right, was he on a leave of absence at the
16  time?
17  A   Our practice is that when we get into
18  campaign season people take a leave of absence from the
19  State Government.
20  Q   Did Tim Mapes participate in this
21  teleconference?
22  A   Yes, he did.
23  Q   Did Steve Brown your press person
24  participate?

Page 147

1   A   At times he would.
2   Q   How long would these last?
3   A   About two hours.
4   Q   And what would be the topics of discussions
5   typically?
6   A   The status of campaigns that we would be
7   involved in.
8   Q   Does that include your re-election campaign
9   as well?
10  A   Yes, it would.
11  Q   Was there any discussion of Jason Gonzales
12  that you recall during these telephone conferences?
13  A   Well, he was one of the opponents in the
14  22nd District.
15  Q   So did you discuss Jason Gonzales?
16  A   To some extent, yes.
17  Q   Did these telephone discussions on Sunday
18  mornings among these individuals including yourself
19  continue all the way up to and including election day?
20  A   Not on election day but close to the
21  election day.
22  Q   Did -- in addition to Jason Gonzales as one
23  of the opponents, did you or any of the other
24  participants talk about the other two opponents?

Page 148

1   A   Yes, we did.
2   Q   Did you talk about Joe Barboza?
3   A   We did.
4   Q   Did all of you discuss and talk about
5   Grasiela Rodriguez?
6   A   Yes, we did.
7   Q   And what decisions, if any, were made
8   regarding the strategy towards these other candidates,
9   if you recall?
10  A   Our basic strategy was to identify the
11  people that are going to vote for me and identify them
12  and get them voted, that was our basic strategy.
13  Q   Well, that's every campaign strategy.
14  A   Yes.
15  Q   Did you look at the demographic back --
16  breakdown of the population in the 22nd District?
17  A   That was not a consideration in the conduct
18  of the campaign.
19  Q   Were you aware that the District was in
20  excess of 70 percent Hispanic in Primary of March 2016?
21  A   I've never heard that it was 70 percent.
22  At the time of drafting, it was about 60 percent.
23  Q   When you say at the time of drafting,
24  you're referring to redistricting?

Page 149

1   A   Yes.
2   Q   And that would have been in 2010, six years
3   before, correct?
4   A   Probably 2011.
5   Q   '11. And would you agree that the District
6   has progressively trended more and more Hispanic over
7   the years?
8   A   Yes.
9   Q   So were you concerned about having a
10  Hispanic opponent Jason Gonzales?
11  A   No.
12  Q   Why not?
13  A   Because I know of my own knowledge that I
14  have widespread support among Hispanic people in the
15  District.
16  Q   So you were not concerned?
17  A   About what?
18  Q   About a Hispanic candidate running against
19  you in the primary?
20  A   I was concerned about Bruce Rauner, that's
21  what I was concerned with.
22  Q   I'm not asking you about Bruce Rauner. I'm
23  asking you about Jason Gonzales.
24  A   No, you asked me what I was concerned with.

38 (Pages 146 to 149)

## Page 150

1  I'm telling you. I was concerned with all the money
2  that Bruce Rauner was going to bring into the election,
3  that's what I was concerned with.
4      Q  So were you concerned that the money that
5  Bruce Rauner was going to bring into the 22nd District
6  election where you were running for re-election would
7  be brought in on behalf of Jason Gonzales?
8      A  Yes.
9      Q  So what were you going to do about that?
10     A  We were going to make sure that the voters
11 in the District knew that Bruce Rauner was on the scene
12 and that he was supporting Jason Gonzales because Bruce
13 Rauner is not a popular person in the 22nd District.
14     Q  As part of your re-election strategy that
15 you developed with these other individuals Marty Quinn,
16 Will Cousineau, Tim Mapes, Steve Brown, yourself, did
17 you discuss bringing in other Hispanic candidates into
18 the 22nd District Primary Race?
19     A  The answer is no.
20     Q  There were two other primary District --
21 22nd District Hispanic candidates in that race other
22 than Jason Gonzales, right?
23     A  The answer is yes.
24     Q  Did you have anything to do with those

## Page 151

1  candidates getting on the ballot?
2      A  We learned about those candidates, again,
3  by word-of-mouth, and we made a judgment that was
4  advantageous to me that there would be multiple
5  candidates in the Democratic Primary. My judgment was
6  at the beginning that not every participant in the
7  Democratic Primary was going to vote for me and the
8  statistic proved that out.
9          So when we learned that there were
10 others that were contemplating candidacies, we thought
11 that would be helpful to my campaign. It would be
12 advantageous to my campaign.
13     Q  So you realized that it would be to your
14 political advantage on election day March of 2016 to
15 have additional Hispanic candidates besides Jason
16 Gonzales on the ballot?
17     A  Not Hispanic, just multiple candidates.
18 And so you study election returns, I study returns, and
19 you know that in my case for certain not every
20 applicant for a ballot in the Democratic Primary is
21 going to vote for me. And, therefore, in a Primary
22 Election it's advantageous to me to have multiple
23 candidates.
24     Q  During these two-hour discussions every

## Page 152

1  Sunday for -- this went on for months, I believe,
2  right?
3      A  I don't remember.
4      Q  Well, you said you started at least in
5  November of 2015, right?
6      A  I don't think I said that.
7      Q  No, you don't remember when you started?
8      A  I think I said I don't remember.
9      Q  All right. Well, when the petitions were
10 filed and you knew who the candidates were, did you
11 then have these meetings going forward all the way
12 through March of 2016?
13     A  I just don't remember the schedule of the
14 meetings.
15     Q  And you do remember as you stated that in
16 addition to Jason Gonzales the names of Joe Barboza and
17 Grasiela Rodriguez came up?
18     A  Well, they were candidates then.
19     Q  Right. You knew that right after November
20 filing date?
21     A  We did.
22     Q  And did you discuss before the filing date
23 before November 29th or 30th of 2015, whenever the
24 filing deadline was, did you discuss with these other

## Page 153

1  members of your telephone discussion group potential
2  other candidates since you felt that it would be
3  helpful to have other candidates in the 22nd District
4  Race?
5      A  We discussed our knowledge that there would
6  be multiple candidates in the Primary Election.
7      Q  Did you reach out to any of your political
8  allies to try to get additional candidates onto the
9  22nd District Primary Ballot?
10     A  I don't remember that.
11     Q  Is it possible that you did?
12     A  No.
13     Q  So you're certain that you didn't?
14     A  I don't remember.
15     Q  Oh, you don't remember.
16         Did you discuss, for example,
17 reaching out to Mike Del Galdo to try to get a
18 candidate from Cicero or somewhere else to run for the
19 22nd District Primary?
20     A  I don't remember that.
21     Q  Did you reach out to Larry Dominick?
22     A  I don't remember that.
23     Q  Did you reach out to Dan Lipinski?
24     A  I don't remember that.

**Page 158**

1 he participated in the Answer and knows. He didn't say
2 he answered everything. So you are saying "you"
3 referring to an entity.
4     MR. PERAICA: The same question was
5 answered in the same way in his Individual answers
6 bottom of Page 3.
7     MR. VAUGHT: Okay. Why did you start with
8 this one?
9     MR. PERAICA: Because I can start with
10 anyone I want.
11     MR. VAUGHT: You can, but regardless the
12 question has been asked and answered. He doesn't
13 remember.
14 BY MR. PERAICA:
15     Q   So my question, Mr. Madigan, is you
16 remembered at least that you had a conversation with
17 Charlie Hernandez, is that correct?
18     A   In that conversation would have been what?
19     Q   In which, even though you don't remember
20 exact date, date unknown, Charlie Hernandez advised you
21 that he knew and was friendly with Joe Barboza, you
22 remember that, right?
23     A   I do.
24     Q   And that Barboza was also friendly with

**Page 159**

1 Jason Gonzales?
2     A   I remember that as part of that document.
3     Q   And did you provide that answer when this
4 document was being responded to?
5     A   That's how the document reads.
6     Q   So it is your answer then, correct? Here's
7 your personal Answer to the Interrogatory. It's at the
8 bottom of that page.
9     A   I see that. I see that. And so Hernandez
10 volunteers to me that he knows Barboza, Barboza knows
11 Gonzales. I think this all started when you were
12 asking did I ask Hernandez to ask Barboza to run, the
13 answer is no.
14     Q   Did you ask Charlie Hernandez to ask
15 Barboza to run in the 22nd District?
16     A   No.
17     Q   Did you ask Charlie Hernandez's wife, Lisa
18 Hernandez, Elizabeth Hernandez, to ask Joe Barboza to
19 run?
20     A   No.
21     Q   Did you ask anybody to solicit Joe Barboza
22 to enter that 22nd District Democratic Primary?
23     A   No.
24     Q   So even though your answer is as it reads

**Page 160**

1 there in response to that Interrogatory Question you
2 have no knowledge of anything else?
3     A   I think you and I are talking on two
4 separate tracks here.
5     Q   Please put me on the right track then.
6     A   Well, there's one statement that talks
7 about information given -- being given to me by
8 Hernandez. There's another track where you're asking
9 did I ask Hernandez to go and find a candidate, and the
10 answer to that is no.
11     Q   Did you have anything to do with the
12 recruitment of Grasiela Rodriguez to run in the 22nd
13 District March '16 Primary?
14     A   The answer is no.
15     Q   Did you know anything about Jason Gonzales
16 before he became interested in running in that 22nd
17 District Race?
18     A   No.
19     Q   Did you know that he had an office in the
20 22nd District?
21     A   No.
22     Q   Did you have anything to do with the no
23 parking signs being put in front of his office?
24     A   I don't even know where the office was, and

**Page 161**

1 the answer is no.
2     Q   Well, Alderman Marty Quinn certainly knew
3 because he would be the one who would have to make
4 those requests to the City Streets and Sanitation.
5     MR. KASPER: Is there a question?
6     MR. SULLIVAN: I'm going to object. That's
7 not a question. Now you're testifying on the record.
8 BY MR. PERAICA:
9     Q   You've been involved in local aldermanic
10 business for a long time, isn't that true?
11     A   I've never served as an Alderman.
12     Q   I know you haven't served, but Alderman who
13 have served as Alderman of the 13th Ward served with
14 you in that same location where you are at daily?
15     A   The answer is yes.
16     Q   So if someone comes in and there are Ward
17 issues you would by osmosis learn about it, if not,
18 directly being told about it, right?
19     A   The answer is yes.
20     Q   And you didn't know anything about the --
21 about the request to have the City of Chicago put no
22 parking signs in front of the office run by the Jason
23 Gonzales campaign, is that your testimony?
24     A   That's my testimony.

Page 206

1  petitions for Joe Barboza and for Grasiela Rodriguez to
2  Springfield?
3       MR. KASPER: Wait. Objection. When?
4       MR. PERAICA: On November 30, 2015.
5       MR. KASPER: No, when are you asking if he
6  had that knowledge?
7  BY MR. PERAICA:
8     Q   Anytime before November 30 of 2015, did you
9  have any idea that Shaw Decremer was working on
10 petitions for Joe Barboza and Grasiela Rodriguez?
11    A   I had no --
12      MR. SULLIVAN: I'm sorry, Mr. Speaker. I
13 apologize.
14      THE WITNESS: Go ahead.
15      MR. SULLIVAN: But I have to interject an
16 objection now because that question is different.
17 Again, your terminology of working on petitions, I
18 object to that because there is absolutely no evidence
19 that's been adduced to this point that Shaw Decremer
20 worked on either petition that you cited in your
21 question.
22      MR. GONZALES: That's my own testimony.
23      MR. SULLIVAN: That's a different --
24      MR. PERAICA: Please.

Page 207

1       MR. SULLIVAN: You never testified to that
2  either. I was at your deposition, too.
3       MR. PERAICA: We're not going to get into
4  an argument here.
5       MR. SULLIVAN: I know but the question,
6  Mr. Peraica --
7       MR. PERAICA: If you want to make an
8  objection, make it, and let's move on so we can get
9  home before 8:00 o'clock.
10      MR. SULLIVAN: I'm trying but your client
11 interjected.
12         All right. I've made my record.
13      MR. VAUGHT: Certify it.
14      MR. PERAICA: Not with him here.
15      MR. SULLIVAN: Your question
16 mischaracterizes the evidence; it assumes facts not in
17 evidence that you posed to the deponent.
18      MR. KASPER: Why don't we go back -- well,
19 go ahead.
20      MR. PERAICA: Are you finished?
21      MR. SULLIVAN: Yes, sir.
22 BY MR. PERAICA:
23    Q   All right. Mr. Madigan, now regarding the
24 two sets of petitions, which I have here a set for Joe

Page 208

1  Barboza and a set for Grasiela Rodriguez.
2          In Shaw Decremer's deposition taken
3  previously he said that he drove them down to
4  Springfield, did you know anything about that?
5     A   No.
6     Q   Did you instruct him to do it?
7     A   No.
8     Q   Did you instruct anyone else to instruct
9  Shaw Decremer to do this?
10    A   No.
11    Q   Did you have any knowledge about it?
12    A   None.
13    Q   Did you have any phone calls with Shaw
14 Decremer on November 30 of 2015 before the filing
15 deadline at 5:00 p.m. on that day, the last day for
16 filing?
17    A   No.
18    Q   Did Shaw Decremer try to reach anyone that
19 you are in touch with or who have perhaps communicated
20 to you I heard from him today, meaning, November 30,
21 2015?
22    A   I have no knowledge of that.
23    Q   Do you know why Shaw Decremer who's a State
24 lobbyist now, as you testified, and who worked on your

Page 209

1  staff for a decade or longer in the past would take
2  petitions for your opponents in the primary of March of
3  2016 to Springfield to file them?
4       MR. KASPER: Objection. How would he know
5  why somebody else was motivated to do something?
6  BY MR. PERAICA:
7     Q   No, I'm asking him do you know why, you, do
8  you know why somebody would do that?
9     A   No.
10    Q   Does Shaw Decremer still lobby in
11 Springfield?
12    A   Well, I wouldn't know if he's still a
13 lobbyist. You could look up the list of lobbyists to
14 see if he's --
15    Q   He is.
16    A   He's still registered?
17    Q   Yes, he is.
18         Have you seen him lately?
19    A   No.
20    Q   Have you seen him since March of 2016, Shaw
21 Decremer that is?
22    A   I presume that I've seen him since then. I
23 presume that I've seen him since then.
24    Q   Did he come to your office to lobby on any

Page 238

1  Q  Did you discuss with any other individual
2  about rewarding Joe Barboza after the March primary in
3  2016 with a job?
4  A  The answer is no.
5  Q  Did you call on behalf of Joe Barboza any
6  individual to recommend Joe Barboza for a position?
7  A  The answer is no.
8  Q  How about the same questions as they relate
9  to Grasiela Rodriguez?
10  A  The answer is no.
11  Q  Besides the group of people that you
12  discussed the March 2016 primary with on these regular
13  telephone calls every Sunday leading up to the
14  election, did you have any other groups of individuals
15  that you worked with or discussed the election with
16  leading up to March 2016?
17  A  Not to my knowledge.
18  Q  You admitted earlier in your
19  Interrogatories that you had conversations with Charlie
20  Hernandez about Joe Barboza, is that correct?
21  MR. VAUGHT: Objection. The Interrogatory
22  says he had a conversation, not conversations.
23  BY MR. PERAICA:
24  Q  So you had one conversation with Charlie

Page 239

1  Hernandez regarding Joe Barboza, is that correct?
2  A  My memory is that in a social setting I had
3  a conversation with Hernandez talking about Barboza and
4  talking about Gonzales, very short.
5  Q  Was Charlie Hernandez the only person that
6  you discussed Joe Barboza with in the Town of Cicero or
7  Cicero Township?
8  A  I have no memory of that.
9  Q  Is there anyone else that you have memory
10  of discussing Joe Barboza with?
11  A  I have no memory today.
12  Q  Is Silvana Tabares still the Chairman of
13  the Committee that you appointed her to the Election
14  Committee?
15  A  She's no longer a member of the House.
16  Q  I see. And when she left the House to take
17  over the Aldermanic position, was she still a Chairman
18  of that Committee that you appointed her to before
19  leaving the House?
20  A  At the time she left she was the Chair of
21  the Committee.
22  MR. PERAICA: I think those are all of the
23  questions that I have.
24  THE WITNESS: You want to take some

Page 240

1  questions from me?
2  MR. PERAICA: After we're done.
3  Other Counsel may have some questions
4  here. If you do, gentlemen, feel free.
5  MR. KASPER: Thank you.
6
7
8
9  CROSS-EXAMINATION
10
11
12  BY MR. KASPER:
13  Q  Mr. Madigan, Mr. Peraica just asked you
14  some questions regarding Representative Silvana Tabares
15  and her appointment to be the head of a committee, do
16  you recall that?
17  A  I do.
18  Q  Do you recall when Representative Tabares
19  was appointed to head a committee?
20  A  I don't remember the exact date, but I know
21  that it occurred after she had completed two terms in
22  the House.
23  Q  And why was she appointed to become the
24  head of a committee?

Page 241

1  A  We have a policy that before someone can be
2  appointed as the Chair of a Committee and get the
3  stipend, they have to have completed two terms. They
4  have to have been elected to three terms -- excuse
5  me -- appointed or elected to three terms. And then
6  they enter an eligible class of people that can be
7  appointed as Chairs of Committees.
8  Q  So her appointment to the Chair of a
9  Committee was based on seniority?
10  A  It's based on seniority, and it's important
11  to understand that she was one of a class. I'm not
12  sure how many people were in that group, but there was
13  a group of House Members who would had gotten to that
14  point where they had either been elected to two terms
15  and now they're beginning their third, which means
16  they'd be eligible to be appointed as a Committee
17  Chairman.
18  Q  And was Representative Tabares treated any
19  differently than any other member of that class?
20  A  No.
21  Q  And has that been your practice
22  historically?
23  A  The answer is yes.
24  Q  Was Representative Tabares' appointment to

Michael J. Madigan
September 13, 2018

### Page 242

1  that Committee Chairmanship conditioned in anyway upon
2  political work?
3    A   The answer is no.
4    Q   I'm sorry. Thank you.
5       Mr. Madigan, Mr. Peraica asked you
6  some questions about your involvement in the 2016
7  Primary Election in your Representative District.
8       Do you recall those questions?
9    A   Yes, I do.
10   Q   Did you take any action personally to
11 recruit any candidates to run in the Primary Election
12 against you?
13   A   The answer is no.
14   Q   Did you direct anyone who works for you or
15 who is associated with you to take any steps to recruit
16 anyone to run in the Primary Election?
17   A   The answer is no.
18   Q   Are you aware of any actions hat anyone who
19 works for you or who is associated with you took in
20 furtherance of recruiting candidates to run against you
21 in the Primary Election?
22   A   The answer is no.
23   Q   Okay. And, Mr. Madigan, Mr. Peraica asked
24 you a number of questions regarding individuals.

### Page 243

1       Do you recall those questions?
2    A   I do.
3    Q   Members of the 13th Ward Organization --
4    A   Yes.
5    Q   -- and other people?
6    A   Yes.
7    Q   And he asked you whether or not you made
8  job recommendations for those people?
9    A   Yes.
10   Q   And you indicated that you had a test --
11   A   Yes.
12   Q   Is that correct, do you recall that?
13   A   Yes.
14   Q   Does that test ever involve doing political
15 work for you or any of your political committee?
16   A   The answer is no.
17   Q   Do you condition job recommendations upon
18 doing political work for you or your political
19 committees?
20   A   The answer is no.
21   Q   Okay. At some point there was a
22 discussion, I'm not sure if there was a question
23 from Mr. Peraica, but there was a discussion regarding
24 Governor Rauner, and I wrote down that (quote) that you

### Page 244

1  said Governor Rauner told you that he was going to
2  (quote) "go after you."
3       Do you recall that?
4    A   I do.
5    Q   What did you take that to mean?
6    A   That he was going to employ the methods
7  that we're now familiar with to discredit me, in
8  affect, defame me and my family name including my
9  daughter the Attorney General.
10   Q   Did you understand that to include
11 supporting a primary opponent against you in the 2016
12 Election?
13   A   I did, because we had a previous attemptat
14 Republican invasion of our primary in 2012.
15   Q   Mr. Madigan, are you familiar Vince Cainkar
16 Vince Cainkar C-a-i-n-k-a-r the Stickney Township
17 Democratic Committeeman?
18   A   Yes, I has.
19   Q   And are you familiar -- Mr. Peraica asked
20 you some questions about Ed Burke the 14th Ward
21 Democratic Committeeman?
22   A   I know him.
23   Q   And Michael Zalewski the 23rd Ward
24 Democratic Committeeman?

### Page 245

1    A   I know him.
2    Q   And Derek Curtis is the 18th Ward
3  Democratic --
4    A   Yes.
5    Q   -- Committeeman, do you know him?
6    A   I know him.
7    Q   And are those the committeemen that makeup
8  the 22nd Representative District?
9    A   The answer is yes.
10   Q   And are there any others?
11   A   To my knowledge, no.
12   Q   And were they the committeemen during the
13 time frame that Mr. Peraica has asked you about
14 March of 2015 through April 2016?
15   A   Again, to the best of my knowledge, the
16 answer is yes.
17   Q   Did you ever have a conversation with
18 Mr. Cainkar regarding the eventuality of you losing the
19 Primary Election having the winner drop out and having
20 you get reappointed to the ballot?
21   A   The answer is no.
22   Q   Did you ever have such a conversation with
23 Alderman Burke?
24   A   The answer is no.

Page 246

1  Q  Did you ever have such a conversation with
2  Alderman Zalewski?
3  A  The answer is no.
4  Q  Did you ever have such a conversation with
5  Alderman Curtis?
6  A  The answer is no.
7  Q  Did you ever direct any of your employees
8  or associates to have such a conversation?
9  A  The answer is no.
10 Q  Are you aware of any such conversations
11 that ever took place between anyone?
12 A  The answer is no.
13 Q  What would you have done had Mr. Barboza
14 won the Primary Election?
15 A  I would have supported him for election in
16 the General Election.
17 Q  What would you have done had Ms. Rodriguez
18 won the Primary Election?
19 A  I would of supported her as the Democratic
20 nominee in the General Election.
21 Q  What would you have done had Mr. Gonzales
22 won the Primary Election?
23 A  I would have supported him as the
24 Democratic nominee in the General Election.

Page 247

1      MR. KASPER: Those are all the questions
2  that I have.
3
4
5
6           REDIRECT EXAMINATION
7
8
9
10 BY MR. PERAICA:
11 Q  Mr. Madigan, you stated earlier that the
12 issue of other candidates possibly running in the 22nd
13 District March 2016 Primary came up well before filing
14 the deadline in November of 2015, right?
15 A  The answer is yes.
16 Q  So you and your circle of advisors or
17 coordinators who had these Sunday morning 2-hour
18 sessions to discuss the campaign talked about this
19 before the three candidates filed on the last day of
20 November 13, 2015, right?
21     MR. VAUGHT: Objection. His testimony was
22 he doesn't remember when those calls began so you can't
23 date it before the filing.
24

Page 248

1  BY MR. PERAICA:
2  Q  I said before November 20 -- November 30 of
3  2015 filing by these candidates who ran against you,
4  you talked about it before, right?
5  A  Counsel is correct. I don't recall when we
6  started the Sunday morning conference calls. There
7  were Sunday morning conference calls. I don't know
8  when they started.
9  Q  What I'm saying is that you discussed with
10 these individuals, regardless of when they started,
11 prior to these petitions being filed by Barboza and
12 Rodriguez on November 30 of 2015, you and your
13 participants on these conference calls talked about
14 other candidates that you heard through the grapevine
15 were running, right?
16     MR. VAUGHT: Same objection. He said he
17 doesn't know when those calls began.
18     MR. PERAICA: I'm not asking him when they
19 started or began.
20     MR. KASPER: But you're assuming they had
21 to of --
22     MR. VAUGHT: But you're saying the calls --
23     MR. PERAICA: I'm saying before
24 November 30 of 2015.

Page 249

1      MR. VAUGHT: You reference on these calls
2  before November of '15?
3      MR. PERAICA: Yes.
4      MR. KASPER: He can't --
5      MR. VAUGHT: He said he doesn't know when
6  the calls began, right.
7      MR. KASPER: Right.
8  BY MR. PERAICA:
9  Q  Well, anytime before November 30 of 2015,
10 do you recall having these conversations with your
11 advisors on the phone?
12 A  Not at this time.
13 Q  You don't?
14 A  Not at this time.
15 Q  Is there anything that would refresh your
16 memory?
17 A  Just spending more time with you.
18 Q  All right, maybe.
19     Do you have any records or documents?
20 A  No.
21 Q  Did you diary these conversations on your
22 schedule?
23 A  No.
24 Q  Were they conducted on your home phone

## Page 258

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JASON GONZALES,           )
                          )
        Plaintiff,        )
                          )
    -vs-                  ) No. 2016 C 7915
                          )
                          )
MICHAEL J. MADIGAN, et al., )
                          )
        Defendants.       )

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of Pages 1 to 260 inclusive, and I do make oath that with the corrections made the same is a true, correct and complete transcript of my deposition so given as aforesaid.

_____
MICHAEL J. MADIGAN

SUBSCRIBED AND SWORN TO
before me this_____day
of_____a.D., 2018.

_____
Notary Public

## Page 259

STATE OF ILLINOIS )
                  )
COUNTY OF C O O K )

I, Kimberly E. Causley, Certified Shorthand Reporter and Notary Public in and for the County of Cook, State of Illinois, do hereby certify that on the 13th day of September at 11:00 p.m., the discovery deposition of, MICHAEL J. MADIGAN, was taken before me, reported stenographically and as thereafter reduced to typewritten form under my direction and control.

The deposition was to be taken at 151 North Franklin Street, Chicago, Illinois, and there were present Counsel as previously set forth.

The said witness, MICHAEL J. MADIGAN, was first duly sworn to tell the truth, the whole truth and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate and complete record of the questions asked of and answers made by the said witness MICHAEL J. MADIGAN, at the time and place herinabove referred to.

The undersigned is not interested in the within case, nor of kin or Counsel to any of the parties.

## Page 260

Witness my official signature and seal as Notary Public in and for Cook County, Illinois, on this 13th day of October A.D., 2018

_Kimberly Causley_
Kimberly E. Causley, C.S.R.