IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JASON GONZALES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 16 C 7915 |
| ) | |
| MICHAEL J. MADIGAN, FRIENDS OF ) | |
| MICHAEL J. MADIGAN, 13TH WARD ) | |
| DEMOCRATIC ORGANIZATION, SHAW ) | |
| DECREMER, SILVANA TABARES, ) | |
| RAY HANANIA, JOE BARBOSA, and ) | |
| GRACIELA RODRIGUEZ, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Jason Gonzales unsuccessfully challenged Michael J. Madigan, representative of Illinois's 22nd district and the Speaker of the Illinois House of Representatives, in the 2016 Democratic primary election. Gonzales has sued Madigan and a number of other individuals and organizations, alleging that they conspired to place two "sham" candidates with Hispanic surnames on the ballot in an effort to dilute Gonzales's electoral support. The defendants have moved for summary judgment.

### Background

The following facts are undisputed except where otherwise noted. Since 1971, Michael J. Madigan has represented Illinois's 22nd district on Chicago's southwest side. He is the chairman of the Illinois Democratic Party and the Speaker of the Illinois House of Representatives. Madigan has served as the House speaker for thirty-three of the

past thirty-five years.

The legislative district Madigan represents geographically overlaps with parts of Chicago's 13th Aldermanic Ward, which is represented by Madigan's political ally Marty Quinn. Alderman Quinn served as Madigan's campaign manager in 2016. In addition, Madigan serves as a 13th Ward committeeman—and, as such, manages political- and election-related activities in the ward—and as the chairman of the 13th Ward Democratic Organization, a private political organization.

**A.     2016 Democratic primary election**

Gonzales challenged Madigan in the 2016 Democratic primary. In addition to Gonzales and Madigan, two other candidates' names appeared on the primary ballot: Joe Barboza and Graciela Rodriguez. Gonzales contends that Madigan, acting through associated individuals and entities, caused Barboza and Rodriguez to enter the race as "sham" candidates whose purpose was to dilute Gonzales's support among Hispanic voters. Madigan denies any involvement in efforts to recruit Barboza or Rodriguez to run in the primary.

In support of his contention that Barboza and Rodriguez were sham candidates, Gonzales points to evidence that individuals associated with Madigan encouraged them to run—even though Madigan was in the race. For example, Kevin Quinn, the brother of Alderman Marty Quinn, testified that Alderman Quinn authorized him to instruct a third Democratic official to contact Barboza about entering the race. Similarly, Rodriguez testified that she discussed the possibility of running with Jennifer Solski, Alderman Quinn's assistant. Gonzales also contends that Barboza and Rodriguez never actively campaigned. For example, Barboza and Rodriguez spent little or no

money on the election and held no rallies.

Gonzales also cites Barboza's and Rodriguez's nominating petitions as evidence that their candidacies were a sham. Under Illinois law, prospective candidates hoping to appear on the primary ballot must obtain signatures on nominating petitions. Volunteers or employees of the 13th Ward Democratic Organization—including so-called "precinct captains"—circulated Madigan's petitions. They also circulated petitions for Rodriguez and Barboza—to run against Madigan, the chairman of the Organization. Although Rodriguez and Barboza both testified that they did not know many of the people who circulated petitions on their behalf, it is undisputed some of their circulators, including Michael Kuba, Joseph Nasella, and Eugene Pagois, were also involved with the 13th Ward Democratic Organization. And it is undisputed that former Madigan staffer Shaw Decremer delivered Barboza and Rodriguez's nominating petitions from Chicago to Springfield, Illinois, where they were filed with the Illinois State Board of Elections.

During the campaign, Gonzales told multiple news outlets (including the Chicago Sun-Times, WTTW, NBC Chicago, and the Wall Street Journal) that he believed Barboza and Rodriguez were sham candidates who were on the ballot at Madigan's behest. Madigan, for his part, testified that he believed that the then-governor of Illinois, Republican Bruce Rauner, was financially supporting Gonzales's campaign.

The primary election was held on March 15, 2016. Out of a total of 26,320 votes, Madigan earned 17,155, or about 65.2%. Gonzales received 7,124 votes (about 27%), Rodriguez 1,523 (5.8%), and Barboza 518 (2%).

**B.     Procedural history**

In August 2016, Gonzales filed the present lawsuit against a number of individuals and organizations, including Madigan, Barboza, and Rodriguez, alleging that they violated his constitutional rights under the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, as well as various provisions of Illinois law. The defendants successfully moved to dismiss the federal claims, but the Court granted Gonzales leave to amend the complaint with respect to all but one of the defendants. *See Gonzales v. Madigan* (*First Motion to Dismiss Ruling*), No. 16 C 7915, 2017 WL 977007, at *5 (N.D. Ill. Mar. 14, 2017).

Gonzales amended his complaint. The Court initially dismissed the amended complaint with prejudice, reasoning that "Gonzales cannot make allegations plausibly supporting a contention that one or more of the defendants acted under color of state law." *Gonzales v. Madigan* (*Second Motion to Dismiss Ruling*), No. 16 C 7915, 2017 WL 2653079, at *7 (N.D. Ill. June 20, 2017). On Gonzales's motion, however, the Court vacated that judgment because it determined that it had applied the "color of state law" requirement too narrowly. The Court then dismissed some but not all of Gonzales's federal claims on different grounds and again granted leave to amend the complaint. *See Gonzales v. Madigan* (*Ruling Vacating Judgment*), No. 16 C 7915, 2017 WL 3978703, at *5, *11 (N.D. Ill. Sept. 11, 2017).

Gonzales filed a second amended complaint. The defendants moved to dismiss Gonzales's state law claims. The Court granted the motion with respect to Gonzales's common-law tort claims in which he alleged defamation and false light but denied it with respect to his state statutory claims. *See Gonzales v. Madigan* (*Third Motion to Dismiss Ruling*), No. 16 C 7915, 2018 WL 1377910, at *3 (N.D. Ill. Mar. 17, 2018). As a result of

that ruling, the remaining defendants are Madigan, Friends of Michael J. Madigan (a Madigan-controlled political action committee), the 13th Ward Democratic Organization, Decremer, Barboza, and Rodriguez.[1] In his remaining claims, Gonzales alleges that each of the defendants violated the Equal Protection Clause and 42 U.S.C. § 1983 (counts 3, 9, 15, 23, 27, 33, and 35); engaged in a conspiracy under section 1983 (count 37); conspired to prevent voting under 10 Ill. Comp. Stat. 5/29–18 (count 38); violated Illinois's statutory analogue to section 1983, 10 Ill. Comp. Stat. 5/29–17, by infringing Gonzales's rights under the federal constitution (count 39); and engaged in a conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(3) (count 40). The defendants have moved for summary judgment.

## Discussion

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019). The Court does not "assess the credibility of witnesses" or "balance the relative weight of conflict evidence," but instead views "all the evidence in the record in the light reasonably most favorable to the nonmoving part[y]." *Palmer v. Franz*, 928 F.3d 560, 565 (7th Cir. 2019). To withstand summary judgment, Gonzales must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles*, 914 F.3d at 1048.

---

[1] Silvana Tabares, a former Illinois state representative and current alderman of Chicago's 23rd Ward, and Ray Hanania, a political journalist, also remain as defendants in this case. It appears from the complaint and the parties' briefs, however, that none of the claims relating to Tabares and Hanania concern their alleged statements about Gonzales's criminal record that remain in the case.

The defendants contend that they are entitled to summary judgment because the federal constitution provides only limited recourse for misconduct during elections. As the Seventh Circuit explained in *Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935 (7th Cir. 2018), "[i]t is impossible to imagine the judiciary attempting to decide when a politically retaliatory step goes 'too far' without displacing the people's right to govern their own affairs and making the judiciary just another political tool for one faction to wield against its rivals." *Id.* at 939. The court further observed that "[a]ny effort by the judiciary to stop one politician from proposing and advocating steps that injure another politician would do more to violate the First Amendment (the right to advocate one's view of good policy is the core of free speech) than to vindicate the Equal Protection Clause." *Id.* The Seventh Circuit has repeatedly expressed similar wariness about involving federal courts in state election disputes. *See Manley v. Law*, 889 F.3d 885, 889 (7th Cir. 2018) ("The Constitution does not guarantee good feelings or regulate manners in political disputes."); *Parra v. Neal*, 614 F.3d 635, 637 (7th Cir. 2010) ("When a plaintiff invokes § 1983 in federal court to challenge the conduct of a state or local election, the district court must balance the protection of the right to vote enshrined in the First and Fourteenth Amendments with the avoidance of excessive entanglement of federal courts in state and local matters."); *Dieckhoff v. Severson*, 915 F.2d 1145, 1148 (7th Cir. 1990) (noting the need to avoid "excessive entanglement of federal courts in state and local election matters"); *Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986) ("[F]ederalism concerns caution against excessive entanglement of federal courts in state election matters.").

Gonzales argues that his claims should nonetheless withstand summary

judgment under the Seventh Circuit's decision in *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973), in which the court held that the plaintiff could pursue his claim that the use of sham candidates in a state election violated the Equal Protection Clause. Alternatively, Gonzales contends that a reasonable jury could find that the defendants discriminated against him as an individual—that is, as a "class of one"—for reasons unrelated to a legitimate government interest under *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995).

**A.**     ***Smith v. Cherry***

Gonzales first argues that a reasonable jury could find that the defendants' alleged election fraud violated his constitutional rights under *Smith v. Cherry*. In that case, the main plaintiff, Ronald Smith, had unsuccessfully challenged the defendant, Robert Cherry, in the Democratic primary election for the office of state senator. *Smith*, 489 F.2d at 1099–100. Smith alleged that Cherry had conspired with the district's senatorial committee to run as a stand-in candidate who, when he won, would withdraw his candidacy to allow the committee to appoint a different person as the Democratic nominee. *Id.* at 1100. The Seventh Circuit held that the plaintiffs' allegations were sufficient to state a claim under the Equal Protection Clause. *Id.* at 1103. The parties agree that *Smith* represents an exception to the general principle that a candidate's misconduct in state and local elections does not give rise to a justiciable claim under the Equal Protection Clause. They dispute, however, whether *Smith* allows Gonzales to withstand summary judgment given the evidence of record in this case.

The defendants contend that *Smith* imposes four requirements for Gonzales's claim under the Equal Protection Clause: (1) the ballot must include a "sham" candidate, defined to mean a candidate who has promised to step down in favor of

7

another person if elected; (2) the fraud must be undisclosed; (3) there must be a reasonable possibility that the sham candidacy affected the outcome of the election; and (4) the alleged misconduct must constitute state action. See Defs.' Brief in Supp. Mot. for Summ. J., dkt. no. 278, at 10–11. Gonzales, by contrast, argues that a claim under *Smith* requires him to show only that the defendant denied him "an equal opportunity to win votes" and that voters "suffered an unequal burden on their right to cast their votes effectively." *Smith*, 489 F.2d at 1102.

### 1. Effect on electoral outcomes

The defendants argue that they are entitled to summary judgment on Gonzales's claim under *Smith* because no reasonable jury could find that it was possible that the alleged sham candidates affected the outcome. They point to Madigan's wide margin of victory—he won more than 65% of the total votes—as well as expert testimony regarding voters' stated preferences as evidence that the alleged fraud was ultimately immaterial.

The defendants' argument depends on a misreading of *Smith*. In relevant part, the Seventh Circuit stated that if the plaintiffs "show a reasonable possibility that Cherry's sham candidacy affected the outcome of the election, then the district court should order new primary and general elections." *Smith*, 489 F.2d at 1103. This reference to the effect on the election's outcome implicates what relief would be appropriate if the plaintiff were to prevail, but nothing in *Smith* or subsequent cases suggests that a plaintiff must prove the likely effect of the fraud to demonstrate a constitutional violation. To the contrary, the Seventh Circuit has explained that

> an election is more than just a sum total of votes. It is also about the *act* of voting—an individual's ability to express his or her political preferences

> at the ballot box. An official who willfully interferes with this act violates the Constitution, regardless whether the vote would have affected the election outcome.

*Kozuszek v. Brewer*, 546 F.3d 485, 490 (7th Cir. 2008). Applying *Kozuszek*, a reasonable jury could find that the defendants' alleged misconduct affected the act of voting by altering the makeup of the primary ballot even if it did not influence who became the Democratic Party nominee.[2] The defendants' argument therefore does not provide a basis for granting summary judgment.

### 2. Nature of the sham candidacies

The defendants next contend that no reasonable jury could find that Barboza and Rodriguez were "sham" candidates within the meaning of *Smith*. Specifically, they point out that the alleged fraud in *Smith* involved a conspiracy between the candidate and the Democratic Party political organization for the candidate to withdraw his name after winning so that the organization could appoint its preferred nominee. The defendants contend that summary judgment is appropriate because there is no evidence that Barboza or Rodriguez made a similar agreement to step aside; indeed, Gonzales appears to concede in his response to the motion for summary judgment that Barboza and Rodriguez would have stayed in the race through the general election if either candidate had won the Democratic nomination. Pl.'s. Resp. to L.R. 56.1 Stmt., dkt. no. 291, ¶ 71; Pl.'s Resp. Br., dkt. no. 292, at 8 (arguing that an agreement to bow out of the election "would have been superfluous").

As an initial matter, the Court concludes that a jury viewing the evidence in the

---

[2] It is undisputed that Gonzales voted in the 2016 Democratic primary election. He thus would have standing to challenge the election misconduct as a voter who "suffered an unequal burden on [his] right to cast [his] vote[] effectively." *Smith*, 489 F.2d at 1102 (internal quotation marks omitted).

9

light most favorable to Gonzales could reasonably find that the defendants solicited Barboza and Rodriguez to run and helped circulate their nominating petitions in an effort to confuse or otherwise dilute Gonzales's support among Hispanic voters and perhaps others. Kevin Quinn testified that his brother, Madigan's campaign manager Alderman Marty Quinn, authorized him to solicit Barboza's candidacy. And Graciela Rodriguez testified that she spoke about the possibility of running with Jennifer Solski, Alderman Quinn's assistant. Based on this testimony, a jury could reasonably conclude that individuals closely tied to Madigan's campaign manager convinced Barboza and Rodriguez to enter the race—against Madigan. Madigan testified that he and Alderman Quinn worked together closely in daily conversations on problems and issues in the campaign. This evidence supports a reasonable inference that Madigan authorized or at least was aware of the recruitment effort. And the evidence concerning the circulation of Barboza and Rodriguez's nominating petitions, particularly the involvement of 13th Ward Democratic Organization precinct captains, provides additional support for Gonzales's allegations. To put it succinctly, a reasonable jury could find that Barboza and Rodriguez's purported candidacies for Madigan's office were orchestrated by Madigan's associates, working on Madigan's behalf. Thus the question is not whether Barboza and Rodriguez appeared on the ballot as a result of the defendants' efforts—a reasonable jury could so conclude, which is the limit of Court's inquiry at this stage—but rather whether the evidence is legally sufficient to allow Gonzales to prevail under *Smith*.

Turning to the governing law, it is not clear from the Seventh Circuit's reasoning in *Smith* that Gonzales must prove that Barboza and Rodriguez intended to step down.

The defendants point to the court's observation that "votes intended for Cherry were really votes for Palmer." *Smith*, 489 F.2d at 1102. But the court also stated that the alleged conspiracy violated Smith's and the voters' constitutional rights because it constituted a "deception on the face of the ballot." *Id.* Gonzales argues that a reasonable jury could find that the defendants propagated such a deception by adding to the ballot candidates with Hispanic surnames whose sole purpose in running was to detract from Gonzales's electoral support. The defendants respond that this alleged deception is insufficient unless, as in *Smith*, those candidates were truly stand-ins—i.e., individuals who ran in the primary with no intention of staying in the race through the general election in the event they became the party's nominee.

The defendants' argument finds some support in *Rudisill v. Flynn*, 619 F.2d 692 (7th Cir. 1980), in which the Seventh Circuit appears to have limited the scope of *Smith*. In *Rudisill*, the court considered whether *Smith* permitted a suit alleging that the defendants first persuaded a local government to place a public referendum on the ballot, the passage of which would financially benefit the defendants, then lied to the voting public about the merits of the ballot measure. The court distinguished *Smith* by observing that "a vote for the sham candidate whose name appeared on the ballot was really a vote for another undisclosed person," which provided the necessary "nexus between the defendants' alleged misrepresentations and the ballot." *Id.* at 694. At least one other district court (outside this circuit) has characterized an agreement to withdraw as an essential element of a sham candidacy under *Smith*. *See Block v. Marino*, 918 F. Supp. 349, 353 (S.D.N.Y. 1993).

It is not clear, however, that the opinion in *Rudisill* limits claims under *Smith* to

11

cases in which sham candidates agreed to drop out after prevailing in the primary. The court in *Rudisill* identified the "crucial factors" in *Smith*, which were "that (1) the fraud was intimately connected with the ballot, (2) had the purpose and effect of deceiving voters as to the actual effect of their votes, and (3) had the intended result of favoring one relatively distinct group of voters over others." *Rudisill*, 619 F.2d at 694. Although the court emphasized that in *Smith* the sham candidates' agreement to withdraw constituted a fraud intimately connected with the ballot, it did not hold that such an agreement was the *only* actionable election fraud. Perhaps more importantly, this case is distinct from both *Rudisill* and *Smith* in that the intent behind the alleged fraud was for the sham candidates not to win but to *lose*. In contrast to Cherry (the defendant in *Smith*), Barboza and Rodriguez's alleged role was simply to appear on the ballot and siphon votes away from Gonzales rather than to prevail as a stand-in for the real candidate. Under these circumstances, requiring Gonzales to prove that Barboza and Rodriguez had agreed to drop out of the race would be altogether extraneous to the design of the alleged scheme, whose success in no way depended on their victory.

Finally, requiring evidence that the sham candidates intended to withdraw would have the effect of limiting *Smith* to its particular facts. Beyond the previously-cited remarks in *Rudisill*, which admit of multiple interpretations, the Seventh Circuit has not held that *Smith* is so confined. For that reason, the Court is reticent to adopt the defendants' suggestion that a plaintiff may not prevail under *Smith* unless the sham candidates expressly agreed in advance to step down. The defendants are therefore not entitled to summary judgment on this basis.

### 3. Publicity of the alleged fraud

The defendants next argue that they are entitled to summary judgment on Gonzales's claim under *Smith* because the alleged fraud was publicized during the campaign. They point to Gonzales's statements, reflected in numerous articles published in local and national news outlets, in which he alleged that Madigan or his associates put Barboza and Rodriguez on the ballot to target Gonzales's base of support. *See, e.g.*, Paris Schutz, *Michael Madigan Faces Primary Challenger Jason Gonzales*, WTTW, Dec. 22, 2015, Defs.' Ex. 14, dkt. no. 280–14 ("Gonzales says [Barboza and Rodriguez] were planted by Speaker Madigan's operation to dilute the Hispanic vote, which makes up the overwhelming majority of the district.").

The defendants again rely on *Rudisill*, in which the Seventh Circuit interpreted *Smith* to require that the alleged fraud "had the purpose and effect of deceiving voters as to the actual effect of their votes." *Rudisill*, 619 F.2d at 694. In affirming the district court's dismissal, the court explained, "The merits of a ballot issue are matters reserved for public and private discussion and debate between opponents and proponents. It is for the voters, not this court to decide whom to elect and what ballot issues to approve." *Id.* The defendants contend that, under *Rudisill*, "as long as the truth is publicly known, the objector's remedy is to use that truth to persuade voters at the ballot box." Defs.' Brief in Supp. Mot. for Summ. J., dkt. no. 278, at 14.

Gonzales argues that *Rudisill* is distinguishable because that case concerned alleged misrepresentations about the provenance and purpose of a particular ballot measure, not the existence of a sham candidate. But the Seventh Circuit suggested more recently in *Jones* that the principle of *Rudisill* should apply more broadly than Gonzales contends. When a candidate for state office deploys dirty tricks in an election,

13

the court in *Jones* held, "[t]he right response is political"—that is, "[t]he price of political dirty tricks must be collected at the ballot box, rather than the courthouse." *Jones*, 892 F.3d at 939–40. The court reasoned that it "is impossible to imagine the judiciary attempting to decide when a politically retaliatory step goes 'too far' without displacing the people's right to govern their own affairs and making the judiciary just another political tool for one faction to wield against its rivals." *Id.* at 939. Although the plaintiff in *Jones* proposed a theory of liability under the Equal Protection Clause different from the one on which Gonzales primarily relies, the Seventh Circuit's admonitions about the risks of judicial intervention into electoral misconduct would appear to apply with equal force in the context of a claim under *Smith*.

To the extent that the court in *Smith* recognized a category of claims challenging electoral misconduct under the Equal Protection Clause, therefore, it stands in some tension with the suggestion in *Jones* that judicial regulation of that misconduct is generally improper. But these holdings can be reconciled by distinguishing cases where the fraud remains hidden during the campaign from those in which the fraud is publicized and widely communicated. The mechanism by which the Seventh Circuit in *Jones* explained that voters can hold candidates to account for election misconduct plainly does not apply to a case like *Smith*, where the alleged conspiracy to have the sham candidate withdraw was hidden from the public until after the votes were cast. The extent of the publicity of the misconduct can delineate cases of non-actionable election misconduct from the types of fraud for which *Smith* provides a judicial remedy.

Applying these principles, the Court concludes that the undisputed fact that, before election day, Gonzales publicized and campaigned on the allegation that

14

Barboza and Rodriguez were sham candidates precludes his claim under *Smith*. In this case, there is unrebutted evidence Gonzales made Madigan's deceptive tactics a central issue in his campaign. *See, e.g.*, Andy Grimm, *Madigan Challenger Gonzales Faces Uphill Climb to Unseat Speaker*, Chi. Sun-Times, Feb. 29, 2016, Defs.' Ex. 16, dkt. no. 280–16, at 1 ("Gonzales said having a pair of Latino-named, no-show candidates on the ballot was the first in a string of dirty tricks he has faced since starting his campaign against Madigan."); Mark Peters, *Election 2016: In Chicago, Candidates Battle Ghosts in the Machine*, Wall Street J., Mar. 14, 2016, Defs.' Ex. 18, dkt. no. 280-18, at 1 (quoting Gonzales as describing Madigan's alleged misconduct as "the oldest trick in the book"). And these reports did not come only from Gonzales. In declining to endorse either Gonzales or Madigan, the editorial board of the Chicago Sun-Times stated that "two other names on the ballot—Joe G. Barboza and Grasiela Rodriguez—are widely seen as inactive Madigan plants to divide the opposition." *Our Endorsements for the Illinois House*, Chi. Sun-Times, Feb. 19, 2016, Defs.' Ex. 15, dkt. no. 280–15, at 3. This publicity placed the alleged misconduct squarely within the political realm, enabling voters to rebuke Madigan by electing his challenger. *Cf. Rudisill*, 619 F.2d at 694 n.1 (noting that, "had the circumstances warranted, voters would not have hesitated to draw an adverse inference" against the perpetrators of the alleged misconduct). Instead, Madigan prevailed by a substantial margin. Under *Jones*, the Court may not appropriately second-guess the voters' choice "without displacing the people's right to govern their own affairs and making the judiciary just another political tool for one faction to wield against its rivals." *Jones*, 892 F.3d at 939.

In reaching this conclusion, the Court does not hold that there is no constitutional

limit on election-related misconduct whenever that misconduct is publicly known before the votes are cast. In particular, the Court is cognizant that there is evidence from which a reasonable jury could find that the defendants engaged in a deliberate effort to interfere with voters' decision making. Such fraudulent interference in the form of sham candidates might, in an appropriate case, undermine the ability of the electorate to hold the offending candidate to account. But Gonzales has not pointed to evidence—or even alleged—that the defendants' fraud prevented the voters from punishing Madigan at the ballot box. Because Gonzales bears the burden of pointing to specific facts establishing a material issue for trial, *Giles*, 914 F.3d at 1048, summary judgment is appropriate under *Jones*.

**B.     Class-of-one claim**

Gonzales argues that even if his claim cannot survive under *Smith*, a reasonable jury could nonetheless find that the defendants violated his constitutional rights by discriminating against him as a "class of one." The Seventh Circuit has explained that a class-of-one claim is "best understood to provide a kind of last-ditch protection against governmental action wholly impossible to relate to legitimate governmental objectives." *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995). Whether Gonzales's claim can withstand summary judgment depends on whether he has introduced evidence from which a reasonable jury could find that the kind of governmental action being challenged lacked a rational basis. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Jones*, 892 F.3d at 939 ("[G]overnmental action in class-of-one situations requires a rational basis.").

The Court need not decide this question, however, because Gonzales's class-of-

one theory is forfeited. Gonzales raised this argument for the first time in his opposition to summary judgment. Although he is not necessarily precluded from raising new legal theories in a summary judgment brief, *see Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017), Gonzales's argument is too cursory to constitute a basis for denying the motion for summary judgment. It is limited to a single paragraph in which he does not attempt to explain what evidence would permit a reasonable jury to find that the defendants lacked a legitimate governmental objective. The only case he cites is *Esmail*, which concerned an entirely different context in which a government official engaged in a course of harassment out of sheer malice. *See Esmail*, 53 F.3d at 179 ("If the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court."). *Esmail* is entirely unhelpful to Gonzales's case, as he has not argued or pointed to evidence that the defendants' conduct was motivated by malice or personal animosity. Gonzales has thus forfeited this "perfunctory and underdeveloped" argument. *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014); *see also United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with *pertinent* authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point."); *cf. Jarrard v. CDI Telecomm., Inc.*, 408 F.3d 905, 916 (7th Cir. 2005) (holding that underdeveloped arguments were forfeited on appeal because the litigant's briefs lacked "citation to relevant authority or meaningful argument").

**C.     Defendants' remaining arguments**

The defendants also argue that they are entitled to summary judgment because a reasonable jury could not find that the defendants acted under the color of state law or that they were motivated by racial animus within the meaning of 42 U.S.C. § 1985(3). The Court need not resolve these issues, however, because summary judgment is appropriate for the reasons previously discussed. The Court's conclusion that Gonzales cannot show that a reasonable jury could find that he suffered an actionable violation of the Equal Protection Clause disposes of all his remaining claims. *See Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (noting that a plaintiff alleging a conspiracy to violate section 1983 "must show an underlying constitutional violation and demonstrate that the defendants agreed to inflict the constitutional harm" (internal quotation marks omitted)); *Dempsey v. Johnson*, 2016 IL App (1st) 153377, ¶ 48, 69 N.E.3d 236, 252 (holding that a claim under 10 Ill. Comp. Stat. 5/29–17 for violation of a federal constitutional right has the same elements as a claim under section 1983); *Kowalski v. Boliker*, 893 F.3d 987, 1001 (7th Cir. 2018) (noting that a claim under section 1985(3) requires proof of a conspiracy to deprive the plaintiff "of the equal protection of the laws"); *Third Motion to Dismiss Ruling*, 2018 WL 1377910, at *3 (noting that both parties have conceded that the claim under 10 Ill. Comp. Stat. 5/29–17 is analogous to the claim under section 1983). Gonzales has not argued that his claim under 10 Ill. Comp. Stat. 5/29-18, which prohibits conspiracies to interfere with voting, can survive independently from his federal constitutional claims, and the defendants are thus entitled to summary judgment on count 38 as well. *See Burton v. Kohn Law Firm, S.C.*, No. 18–2059, 2019 WL 3757571, at *3 (7th Cir. Aug. 9, 2019) ("[T]o survive summary judgment the nonmoving party must present evidence sufficient to establish a triable

issue of fact on all essential elements of [his] case.").

In addition, because the Court concludes that the defendants are entitled to summary judgment on all the remaining claims, the plaintiff's outstanding motions to strike the defendants' affirmative defenses are moot. *See* dkt. nos. 180, 181; *see also Juniel v. Park Forest-Chicago Heights Sch. Dist. 163*, 161 F. Supp. 2d 910, 911 n.1 (N.D. Ill. 2001) (denying as moot motions to strike in light of the grant of summary judgment).

## Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment [dkt. no. 277]. The Court denies as moot the plaintiff's motions to strike the defendants' affirmative defenses [dkt. nos. 180, 181]. The Clerk is directed to enter judgment in favor of defendants and against plaintiff.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 23, 2019